COMMONWEALTH *vs.* ROBERT F. WILSON.

Norfolk. January 6, 1970. — February 12, 1970.

Present: WILKINS, C.J., KIRK, SPIEGEL, & REARDON, JJ.

*Identification. Constitutional Law,* Identification, Due process of law, Assistance of counsel. *Error,* Whether error harmful. *Practice, Criminal,* Assistance of counsel, Suppression of evidence by prosecutor, Examination of jurors. *Evidence,* Hostile witness, Cross-examination, Judicial discretion. *Jury and Jurors.*

Placing a defendant in a murder case in a lineup at a police station next to three policemen known to an eyewitness who immediately recognized the defendant as the murderer, although the witness did not identify him to police until later because the witness "was scared," in the circumstances was not so "unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny the defendant due process of law. [54]

Upon appeal from a conviction of murder by shooting, where it appeared that an eyewitness had several opportunities to observe the defendant at the time of the crime and "saw the full view" of the defendant's face, and accurately described his physical appearance and clothing, it was held that an in-court identification of the defendant by the witness had an origin "independent" of an alleged improper photographic identification procedure in which the witness several times had not identified photographs of the defendant because the witness was "afraid," and that the witness' in-court identification was "purged of . . . [any] primary taint" of such procedure. [55]

Where it appeared at a trial for murder by shooting that two eyewitnesses had ample opportunity to observe the defendant at the time of the crime, that before trial they were shown photographs of the defendant in the absence of his counsel, that in several instances they had not identified the defendant because of fear, and that the defendant was given broad latitude in cross-examination of the witnesses regarding their observations and the effect, if any, their viewing the photographs had on in-court identifications of the defendant by them, it was held

that even if the exhibition of the photographs was a "critical stage" of the proceeding, the absence of the defendant's counsel thereat did not result in "substantial prejudice to the defendant's rights" or require suppression of the in-court identifications. [55–56]

There was no error in a murder case in the denial of a motion by the defendant to be furnished with a television film in the Commonwealth's possession showing the defendant being arrested, which the defendant claimed might have resulted in exclusion of in-court identifications of the defendant as the murderer by two witnesses, where it appeared that one witness had not seen the film and that identification of the defendant by the other witness, who had seen the film, was not affected by it. [56–57]

There was no error prejudicial to the defendant in a murder case in the denial of a motion by him to be furnished with a police report containing a statement made to the police on the evening of the crime by an eyewitness, that he "doubted" that he could recognize the man who did the shooting as he "did not get a good look at his face," where it appeared that the prosecutor made the report available to the defendant after direct examination of the eyewitness at the trial and that the defendant used it for an extended cross-examination of him. [57–58]

At a criminal trial, the defendant may cross-examine a police officer testifying for the Commonwealth without showing that he is hostile. [58]

At a voir dire in a criminal case, no abuse of discretion with respect to cross-examination by the defendant was shown where it appeared that he cross-examined without interruption a police officer called by the Commonwealth, and where, although the defendant was not allowed to cross-examine eyewitnesses called by him, one of whom had had an interview with him but had not answered any questions at that time and the other of whom had refused to be interviewed by him, it did not appear that they were hostile. [58–59]

Any error in excluding at the trial of a murder case a television film showing the defendant's arrest which was seen by an eyewitness who subsequently identified the defendant, and in excluding the television script of the arrest, was harmless, and not a denial of due process of law, where the defendant extensively cross-examined witnesses respecting the film. [59–60]

At the trial of an indictment for murder, after the seating of an unchallenged juror who came from the city in which the crime had been committed and a discussion between the defendant and the judge regarding the empanelment which had no prejudicial effect or influence on the jury, there was no error in the judge's refusal to permit "defense counsel an opportunity to state his reasons for objecting to the impanelment of the juror . . . outside of the presence and hearing of the jury." [60]

INDICTMENT found and returned in the Superior Court on June 7, 1968.

The case was tried before *Paquet,* J.

*Robert A. Stanziani* for the defendant.

*A. Russell Lucid, Jr.,* Special Assistant Attorney General, for the Commonwealth.

SPIEGEL, J.   The defendant was tried on an indictment which charged that on or about May 11, 1968, he "did assault and beat Richard Webber, with intent to kill and murder him, by shooting him, and by such assault and beating did kill and murder said Richard Webber."   The jury returned a verdict of guilty of murder in the first degree with a recommendation that the sentence of death be not imposed.   The case was tried subject to G. L. c. 278, §§ 33A–33G, and is here by way of appeal.   The defendant filed twenty-three assignments of error but argues only seven of them.   Those assignments not argued are deemed waived.   *Commonwealth* v. *Kleciak,* 350 Mass. 679, 681.

On Saturday, May 11, 1968, between 6 and 6:30 P.M. Richard Webber, the victim, left the North Quincy Taxi Company office, where he was employed as a driver.   He was next seen by one Barbara Bennett, a waitress and bartender at the Quincy Lounge, Quincy, when she reported for work at 6:45 P.M.   The defendant "came in" after Mrs. Bennett had gone on duty as the bartender.   One Victor J. Barbati, an owner of the Quincy Lounge, arrived at the lounge "[b]etween eight and 8:30."   Following Barbati's arrival, the defendant and Webber exchanged words, after which "they grabbed each other and . . . fell . . . to the floor. . . . Webber was on the floor on his back . . . [and the defendant] was on top of him."   Barbati then went over to the two men "and tried to break . . . up" the fight.   He "pulled" the defendant off Webber and "tried to . . . take him out of the bar."   However, Webber "got up and charged towards . . . [the defendant], swinging at . . . [him]."   The defendant then broke away from Barbati and the two men "started . . . fighting again."   The fight was finally stopped and the defendant was "pulled . . . outside the door."   In the interim Webber left the lounge and pro-

ceeded in the direction of "the North Quincy cab stand, Quincy Square."

On that same evening, one John A. Davis, the night dispatcher for the North Quincy Taxi Company "came to work" at 5 P.M. When Davis arrived, Webber was then at the office on "stand-by duty," waiting to see whether "he may have been needed to drive at night." Webber left the stand "between 6:00 and 6:30" P.M. The taxi company office was equipped with a two-way radio, a desk, a pair of telephones and other equipment. On the evening in question Davis, as was his custom, went out of the office and "screwed in" the light on the "left-hand side of the . . . building." Prior to 8:30 P.M. he noticed that the street lights were on and the lighting was "excellent." About 9 P.M. Webber "returned to the cab stand. . . . He looked nervous and afraid . . . his clothes were disarranged, and he had a couple of marks on him." After Webber entered the office, he walked to the desk where Davis was sitting "picked up the phone . . . dropped . . . [it], and . . . was fumbling around with different objects on the desk." When Webber entered the office he left the door open and Davis observed the defendant approaching the building. After talking with Davis, Webber "stepped outside the cab stand." The defendant was then standing "about twelve or fifteen feet" from the office, when Webber left the building. Webber was "yelling, '[l]eave me alone, stay away from me, stay away from me, leave me alone.'" The defendant stepped up on the curb holding a forty-five calibre automatic in his hand. He had "the gun in around his chest area, . . . he pulled . . . [it] up . . . leveled it toward . . . Webber who was running, and he shot." Davis "ducked" under the desk after the shot was fired. As he arose he saw the defendant turn and run. Shortly thereafter Davis "went out and put . . . [his] sweater over . . . Webber." The cause of Webber's death was "a gunshot wound of the heart." A forty-five calibre bullet was removed from his "left front chest."

At the time the shooting occurred one Sean O'Brien, a

driver for the taxi company, was also present at the office and his testimony substantially corroborated Davis's.

1. Assignments 12 and 13 claim error in the judge's denial of the defendant's motion to suppress "the identification testimony" of the witnesses O'Brien and Davis.

The defendant argues that the improper identification procedure involving the photographs and "the display of photographs of the defendant to the two eyewitnesses to the murder in the absence of the defendant's retained counsel" were respectively a denial of due process of law under the Fourteenth Amendment of the Constitution of the United States and a violation of the Sixth Amendment "right to counsel at a critical stage of the proceedings."

We shall first discuss the propriety of the identification procedures. On Sunday, May 12, 1968, O'Brien, in the presence of defence counsel, observed the defendant at a lineup containing nine men which was conducted at the Quincy police station. Although O'Brien recognized the defendant, he did not identify him at that time. On the following Tuesday O'Brien called the district attorney and subsequently went to his office. O'Brien discussed the case for about an hour with the district attorney and with one Lieutenant John Regan of the State police. During this meeting O'Brien was not shown any photographs of the defendant. The next day two State police officers came to O'Brien's home and told him that they had a picture of the lineup O'Brien had viewed the previous Sunday. Before O'Brien was shown the photograph, he told the officers that the defendant was the "fourth one in on the right as you are looking at the photo." O'Brien then drew a circle around the defendant's picture. At the trial O'Brien was asked the following question: "At the time you saw . . . [the defendant] at the Quincy [p]olice [s]tation in the lineup, is there any question in your mind that you were able to recognize the defendant . . .?" He replied, "The minute I saw him in the lineup I recognized him." He did not identify the defendant at that time because he "was scared."

The defendant maintains that his position in the lineup suggested the defendant to O'Brien. The evidence, however, readily answers this contention. Although the defendant was the fourth man from the right, immediately adjacent to three policemen who were known to O'Brien, he was immediately recognized by O'Brien. In these circumstances we believe that the defendant's placement in the lineup was not so "unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law. *Stovall* v. *Denno, Warden,* 388 U. S. 293, 301–302. See *Simmons* v. *United States,* 390 U. S. 377, 383.

We next discuss the identification of the defendant by Davis. On the evening the shooting took place Davis told the police he did not think he could identify the individual who did the shooting because "he did not get a good look at his face." On May 12, 1968, Davis, at the request of the police, went to the police station. He was shown a "[p]icture of a lineup," but he did not identify the defendant. Following this visit Davis knew that the defendant had been arrested and he had seen a television clip showing the defendant being taken into custody. Between three and five days after the shooting, Davis was visited by two State police officers and was shown a photograph of the lineup viewed by O'Brien. Davis did not make an identification at that time. On Sunday, May 19, 1968, Davis was again requested to come to the police station and was shown two "face view" photographs of the defendant. Again Davis did not identify the defendant.

On May 24, 1968, Davis finally identified the defendant at a probable cause hearing held at the Quincy District Court. It is well recognized that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States, supra,* at 384. Davis testified that he had several opportunities to observe the defendant. He "saw the full view"

of the defendant's face, accurately described the defendant's physical appearance, and the clothing the defendant was wearing at the time of the shooting. At the trial Davis was asked the following question in cross-examination: "[I]s it fair to say . . . that . . . last May 11, 1968 you weren't sure of the identification of . . . [the defendant] but that you are today?" Davis replied that this was not so. He stated that he did not identify the pictures of the defendant because he "was very much afraid of repercussions about this . . . [for] his family and himself." Although Davis admitted that on the night the shooting took place he told the police he "didn't get a good look" at the defendant's face, he said the reason he told this to the police at that time was because he "was afraid."

Even assuming that the identification procedure was improper we are of opinion that the "in-court identifications [of the defendant] had an independent origin." *United States* v. *Wade*, 388 U. S. 218, 242. Davis's in-court identification of the defendant was "purged of the primary taint" of any improper identification procedure. *United States* v. *Wade, supra,* at 241. *Commonwealth* v. *Cooper*, 356 Mass. 74, 84.

We now consider the defendant's contention that he was denied counsel at a critical stage of the proceedings. We recognize that the Sixth Amendment right to counsel may apply to "*any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself.'"[1] *United States* v. *Wade, supra,* at 227. *Commonwealth* v. *Cooper*, 356 Mass. 74, 82.

Assuming that the exhibition of the defendant's photograph to the witnesses was a "critical stage" of the proceedings, we do not believe that the absence of defence counsel at that confrontation resulted in "substantial preju-

---

[1] See *Foster* v. *California*, 394 U. S. 440.

dice to the defendant's rights." *United States* v. *Wade,*
*supra,* at 227. Even if the identification procedures are as-
sumed to have been in violation of the defendant's con-
stitutional rights, the witnesses are not precluded "from
making valid in-court identifications." *Commonwealth* v.
*Cooper, supra,* at 84. The Commonwealth has the op-
portunity to establish that the in-court identifications
stemmed from observations of the defendant at a time other
than the improper photographic display. *United States* v.
*Wade, supra,* at 240. We believe that O'Brien and Davis
each had ample opportunity to observe the defendant at the
time of the shooting. It is reasonable to conclude that their
failure to identify the defendant did not result from their
inability to identify him, but stemmed solely from their fear
of identifying him. We note, too, that at the trial the de-
fendant was given broad latitude in the cross-examination
of Davis and O'Brien regarding their observations of the de-
fendant at the time of the shooting. The defendant was also
permitted to extensively cross-examine the witnesses in an
attempt to determine what effect, if any, the viewing of the
photographs may have had on their in-court identifications
of him. In these circumstances, we are of opinion that
although the defendant was not represented by counsel at
the pretrial photographic confrontation, the absence of
counsel was harmless error. *Chapman* v. *California,* 386
U. S. 18. There was no error in denying the motions to
suppress the in-court identifications of the defendant.

2. Assignments 1, 2 and 4 are based on the denial of the
defendant's motions "to be furnished with exculpatory evi-
dence" and "for production of the Police Department re-
ports." No exception was taken to the denial of the motion
to be furnished with exculpatory evidence. Nevertheless
because this is a capital case, we also consider the motion
regarding the exculpatory evidence. See *Commonwealth* v.
*White,* 353 Mass. 409, 424.

The defendant contends that the Commonwealth sup-
pressed "two pieces of relevant evidence," a television clip
showing the defendant being arrested and the statement

Davis made to the police that he doubted he could recognize the individual who did the shooting as "he did not get a good look at his face." He also claims "[t]here is the probability that had the film been viewed by the Court and the statement by Davis admitted on the motion to suppress, . . . [Davis's] testimony would have been excluded." The defendant further asserts, "[t]here is also the possibility that if the film was shown it may have been so susceptible to the vice of suggestion as to have excluded both in-court identifications by Davis and O'Brien."

At the time of the voir dire hearing on the defendant's motion to suppress the identification testimony it seems clear that the Commonwealth had possession of the television film. It was not produced at the hearing and the defendant, at that time, did not request that it be produced so that the judge might view it. However, the evidence disclosed that although Davis had seen the film, his identification of the defendant at the probable cause hearing had not been affected thereby.

We have difficulty in following the defendant's argument that had the film clip been shown to the court not only would Davis's in-court identification have been excluded, but O'Brien's in-court identification would also have been excluded. There was no evidence that O'Brien had ever seen the film. In fact, on cross-examination the defendant did not even ask O'Brien if he had seen the film. In these circumstances, we do not agree with the defendant that the showing of the film would have resulted in the exclusion of the in-court identifications by either Davis or O'Brien.

We next consider the defendant's argument that the statement of Davis in the police report was exculpatory. The report shows that Davis said he "doubted" that he could recognize the fellow who did the shooting as he "did not get a good look at his face." The instant case differs substantially from *Brady* v. *Maryland*, 373 U. S. 83, relied on by the defendant. In that case the prosecution withheld a co-defendant's confession to the murder with which the defendant was charged and found guilty.

Even if we assume that the statement was exculpatory, and although we are unaware of any reason for the judge's refusal to allow the defendant's motion at the trial, the Commonwealth made the police report available to the defendant after direct examination of Davis because it felt that it was "possibly of exculpatory nature."[2] The defendant had the opportunity to use, and did use, the contents of the report as a basis for an extended cross-examination of Davis on this point. The report was used to full advantage in an attempt to impeach the credibility of Davis's identification. We are of opinion there was no prejudicial error.

3. Assignment 14 states that "the trial judge erred in unduly restricting the scope of the voir dire on the motions to suppress identification testimony . . . by refusing to let defense counsel cross-examine the witnesses who testified and introduce evidence on behalf of the defendant." The defendant contends that these restrictions constituted "a denial of due process of law." He argues that "it is unrealistic to rule that . . . [he] cannot cross-examine police officers who are hostile to him." Once again it is difficult to follow the defendant's argument. In the first place, it is unnecessary for a defendant to show that a police officer, a witness for the Commonwealth, is hostile in order to permit the defendant to cross-examine him. Secondly, the transcript reveals that at the voir dire the defendant was not only permitted to cross-examine the *one* police officer called by the Commonwealth, but that the cross-examination was conducted without a single interruption by either the prosecutor or the court. In any event, the extent of cross-

---

[2] The record discloses that after the police report containing Davis's statement was given to defence counsel the following discussion took place at the bench: THE COURT. "Do you want time to look them over before you start your cross-examination or not?" COUNSEL FOR THE DEFENDANT. "Judge, I suppose I should." THE COURT. "Do you or not want time to look them over?" COUNSEL FOR THE DEFENDANT. "Can I have a five-minute recess, please?" THE COURT. "I said do you want time. If you do, then I will rule." COUNSEL FOR THE DEFENDANT. "Yes." THE COURT. "You want time?" COUNSEL FOR THE DEFENDANT. "Yes." THE COURT. "All right." (End of bench proceeding.) THE COURT. "We will take a short recess, jurors, on account of the matter that just developed." (Recess.)

examination rests within the sound discretion of the trial judge. *Commonwealth* v. *Coshnear*, 289 Mass. 516, 527.

We now turn to the defendant's claim that he was "forbidden to cross-examine . . . witnesses [for the Commonwealth]," who "had made a substantial showing of hostility when . . . [the defendant] attempted to interview them." This contention is directed at the defendant's voir dire examinations of Davis and O'Brien. However, Davis and O'Brien were called as witnesses for the defence. "Rulings on whether a witness is hostile and whether cross-examination of the witness by his proponent should . . . be permitted are within the discretion of the trial judge." *Commonwealth* v. *Monahan*, 349 Mass. 139, 162–163. There is no evidence that the witnesses were hostile. During an interview with the defendant, Davis explained that he preferred not to answer any questions concerning the shooting at that time because he wanted to explain the circumstances "in court one time and one time alone." While O'Brien admittedly refused to be interviewed by the defendant, the refusal is not necessarily proof of hostility. There was no evidence that O'Brien was biased against the defendant. Even on the occasions when the defendant was prevented from cross-examining his own witnesses, he did not raise the question of their being hostile. We perceive no abuse of discretion.

Our final consideration under this assignment of error deals with the defendant's contention that the judge wrongfully "excluded the script of the newscast of the . . . [defendant's] arrest" because of the film's relevancy on the issue of suggestive identification. It seems to us that the script without the showing of the newscast would not be admissible. If the film had been admitted in evidence as it should have been, the script would be admissible. Nevertheless, as heretofore outlined, because of the extensive cross-examination permitted the defendant regarding the film, any error relating to either the film clip or its accompanying script was harmless. Reviewing all of the evidence in proper context

leads us to conclude that there was no "denial of due process of law."

4. Assignment 9 is based on the judge's failure to permit "defense counsel an opportunity to state his reasons for objecting to the impanelment of the juror, Francis E. McGinty, outside of the presence and hearing of the jury." Contrary to the defendant's assertion, there is no reason to "believe that . . . McGinty would not be a suitable juror because of his familiarity with the locale and the facts of the case." The defendant did not challenge the juror, but stated that he had "additional questions" which he thought were "pertinent." The judge inquired whether the fact that the juror came from Quincy was "a factor" and the defendant's counsel replied in the affirmative. After this colloquy the judge permitted him to approach the bench. After the conference, and apparently at the defendant's suggestion, the judge asked McGinty if he had read about the shooting. McGinty replied, "I don't recall ever having read anything about it." The judge then declared him "indifferent."[3] The defendant's reliance on the case of *Commonwealth v. Crehan*, 345 Mass. 609, 612–613, is unfounded. The discussion between the defendant and the judge regarding the empanellment of McGinty was not of a nature to have a prejudicial effect on the jury or to influence them in any way. We are satisfied that "[i]n all respects the judge was meticulous to insure the empanelling of a jury free from bias." *Commonwealth v. Kiernan*, 348 Mass. 29, 36.

Finally, mindful of the obligation imposed by G. L. c. 278, § 33E, as amended by St. 1962, c. 453, we have reviewed the entire record with great care and are of opinion that justice does not require a new trial or the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*

---

[3] Following this statement by the judge there was a conference between the defendant and his counsel, after which the court was informed that the defendant was "satisfied." Thereupon McGinty was "sworn" as a juror. After McGinty had been directed to "join the other jurors" defendant's counsel again addressed the court and took an exception to the empanelling of McGinty.