COMMONWEALTH *vs.* JAMES ROSS, JR.
(and eight companion cases [1]).

Suffolk.   December 6, 1971. — April 27, 1972.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & BRAUCHER, JJ.

*Identification.   Practice, Criminal,* Assistance of counsel, Examination of jurors.   *Constitutional Law,* Assistance of counsel, Self incrimination.   *Evidence,* Inculpatory communication, Relevancy and materiality.   *Search and Seizure.   Probable Cause.   Jury and Jurors.*

At the trial of indictments for armed robbery, assault with a dangerous weapon, and assault and battery with intent to murder, the trial judge correctly admitted in-court identifications by a witness and the victim where there was clear and convincing evidence that the in-court identifications were made independently of possibly suggestive out of court identification procedures inasmuch as both witnesses had ample opportunity to observe the defendants they identified in court at close range at a well lighted gasoline station in circumstances which aroused their suspicion and caused them to scrutinize the defendants' appearances immediately prior to the commission of the crimes. [670–672, 675–676]

Presence of the defendant's counsel in a criminal case is not required by the Sixth Amendment to the Constitution of the United States at a photographic identification procedure conducted in the defendant's absence since the showing of standard police identification photographs does not constitute a State compelled confrontation or exhibition. [673–675]

Where the police showed a series of pictures of black males of approximately the same age as the defendants in a criminal case to a witness and to the victim on separate occasions prior to trial and only the pictures of the three defendants contained their names and other information concerning the subjects of the photographs on the reverse side, the police photographic identification procedures were not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification because the witness did not see the writing on the reverse side of the photographs and the victim did not notice it until after he had made his identification [672–673, 675–676]; the fact a police officer pointed to the picture of one of the defendants and asked the witness about him by name was not significant where the witness had already identified that defendant an hour earlier at a prior showing of the photographs [673].

[1] Of the companion cases two are against James Ross, Jr., three are against Roy Daniels, Jr., and three are against James Williams.

Admission at a criminal trial of a witness' testimony concerning a voluntary inculpatory gesture made by one of the defendants at his arraignment to the witness, who had been brought to the courtroom by the police to view the arraignment and, if possible, make an identification, was proper although the defendant's counsel was not present. [676–679]

At the trial of indictments for armed robbery, assault with a dangerous weapon, and assault and battery with intent to murder against three defendants, where the victim testified that three black men had robbed him of money including a five dollar bill after one of them, whom the victim identified in court as one of the defendants, had stabbed him and that he bled profusely, admission in evidence of a blood stained five dollar bill, which was seized by the police when it inadvertently came into plain view during a routine inventory of that defendant's possessions was proper since the bill tended to prove the fact that a robbery had taken place involving the three defendants [679–680]; the seizure of the bill was not unconstitutional [680–682]; and the blood stains on the bill did not make it so inflammatory as to be inadmissible [680].

There was no abuse of the trial judge's discretion at a criminal trial in denying a black defendant's request that the veniremen be asked specific questions on the subject of racial prejudice. [682]

INDICTMENTS found and returned in the Superior Court on March 25, 1970.

Motions to suppress were heard by *Hennessey,* J., and the cases were tried before him.

*Mary C. Kingsley* (*Reuben Goodman* with her) for Roy Daniels, Jr., & another.

*Michael G. West* for James Ross, Jr.

*Gerald F. Muldoon,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J.   The defendants Ross, Daniels, and Williams appeal under G. L. c. 278, §§ 33A–33G, from convictions on nine indictments arising out of an armed robbery of Timothy Lehane, a security guard at Boston University. Each defendant was charged with armed robbery, assault with a dangerous weapon, and assault and battery with intent to murder. The principal assignments of error argued on appeal relate to the trial judge's refusal to suppress the in-court identification of the defendant Daniels by the victim Lehane and the in-court identifications of all three defendants by a witness, Howard Lembeck. In addition, the defendant Ross argues that

the judge erred in admitting evidence of an inculpatory gesture by him, in admitting certain paper money in possession of the defendant Daniels, and in denying his request that the judge ask certain questions of proposed jurors to determine possible racial prejudice.

From the evidence presented at voir dire and at trial, the following appears: On March 6, 1970, at 4 A.M. a black 1960 Oldsmobile containing three black males pulled up beside the pumps at Silva's Texaco Station, 601 Commonwealth Avenue, Boston. Howard Lembeck, the attendant on duty, conversed with the men, who remained inside the automobile. He sold one of them an inflated plastic rabbit. At one point, he leaned inside the car and passed out cigarettes to each of the men and, at another point, the men asked whether the Boston University radio tower was open, and Lembeck replied, "I don't know." Apart from two brief visits to the station office, Lembeck stood next to the Oldsmobile beside the rear window on the passenger's side. Allegedly, the defendant Ross was seated in front on the driver's side, the defendant Williams in front on the passenger's side, and the defendant Daniels in back on the passenger's side. The area in which the vehicle was parked was illuminated by floodlights.

After fifteen or twenty minutes, Lehane drove into the pump area of the filling station in an unmarked Boston University security automobile. The man identified as Daniels questioned Lembeck about Lehane, and Lembeck told him that Lehane was a security guard at Boston University. This man then got out of the Oldsmobile and, carrying the plastic rabbit, approached Lehane who, in the meantime, had gotten out of his vehicle. In plain view of Lembeck, the man and Lehane conversed for approximately two minutes in which time the man offered to sell Lehane the plastic rabbit. He also asked whether "Eddie" was over at the School of Public Communications and Lehane answered that he would go over and find out. Following the conversation, Lehane left the filling station and drove up Commonwealth Avenue to the School of

Public Communications. The man identified as Daniels and his two companions followed in the Oldsmobile and parked two car lengths in front of Lehane's car on Hinsdale Street. A brutal and unprovoked attack ensued in which Lehane received serious, multiple stab wounds. The man identified as Daniels was the first to attack but the other men later joined in. At one point an assailant said, "Get his gun," and then the victim felt a hand reach into his pocket and take his wallet. The three men then left Lehane bleeding, on the ground. Back at the filling station, five or ten minutes after Lehane and the three men had left, the attendant Lembeck observed the black 1960 Oldsmobile coming down Commonwealth Avenue at a high rate of speed with three black male occupants.

Later the same morning at approximately 6 A.M., two Boston police officers in a patrol car observed a black Oldsmobile turn from Dartmouth onto Tremont Street, through a flashing red light, at about fifty miles an hour. The officer driving the patrol car was aware of the assault at Boston University about an hour earlier. After a pursuit on Tremont Street, the police officers stopped the Oldsmobile and took the occupants, four black men, into custody. There was a large pink plastic rabbit with visible red stains on the rear deck. At this time a cursory search was made of the men. Later at station 4, while making an inventory of the defendants' possessions, one of the arresting officers removed a wallet, folded in thirds, from the defendant Daniels's outer coat pocket. He slid the wallet across a sloping desk to the booking officer, the fold opened, and out fell a five dollar bill and two ones. Upon observing bloodstains on two of the bills, the police segregated all three bills from the wallet and kept them for further investigation.

Still later in the morning, two police officers interviewed Lembeck at the filling station. Lembeck then went with the officers to the police station, where he made a written statement, and then to the Roxbury District Court, where he observed the defendants Ross and Daniels and a third man in the "lockup" area and later at the

arraignment. On voir dire, Lembeck testified that, without any direction from police, he scrutinized about a dozen men in the "lockup" area, and that privately in his own mind he picked out Ross and Daniels. At trial, he was permitted to testify that the defendant Ross gestured to him from within the wire enclosure by raising a finger to his lips suggesting silence. Also on voir dire, he testified that he identified Ross and Daniels for the police after watching the arraignment but that he did not identify the third man arraigned with them. The defendant Williams, the fourth man in the car, was not present at the arraignment.

About a week later, Lembeck identified the defendant Williams after viewing a group of fourteen police photographs of black males the same age as the defendants. These included pictures of Ross, Daniels, and the third man at the arraignment. Lembeck knew at this time that the police held a fourth suspect who had not been present in the District Court. Lembeck first viewed the pictures at the filling station and made his identification of Williams on the second run through the photographs. He also identified Ross and Daniels. He was then taken to the police station where he again looked at the photographs and identified Williams. Approximately three months later, there was a third showing of the photographs, this time at the district attorney's office. On the same day, Lehane also visited the district attorney's office and viewed the photographs separately. He identified only the defendant Daniels.

After the voir dire hearing the judge below denied the motions of all the defendants with respect to in-court identification testimony but did allow the defendants' motions in so far as they might be "construed as motions to suppress the Commonwealth's offering of the photographic identification procedures by the witnesses Lembeck and Lehane, and the Roxbury courthouse identification procedures by the witness Lembeck." Later at trial, however, the judge limited his last ruling to the extent that he allowed Lembeck to give testimony concerning the

attempt by the defendant Ross to communicate with Lembeck by gesture at the Roxbury District Court.

1. Each defendant contends that the judge erred in permitting Lembeck to identify him at trial. The defendants Ross and Daniels maintain, principally in reliance upon *United States* v. *Wade*, 388 U. S. 218, *Gilbert* v. *California*, 388 U. S. 263, and *Stovall* v. *Denno*, 388 U. S. 293, that Lembeck's in-court identifications were the fruit of impermissibly suggestive pre-trial lineups, conducted in the absence of counsel, in violation of the right of the defendants to counsel, and to a fair trial. In addition, the defendant Ross contends on the basis of *Simmons* v. *United States*, 390 U. S. 377, as does the defendant Williams, that Lembeck's in-court identifications were tainted by prior photographic identification procedures.

The judge after making detailed subsidiary findings on all the issues of identification concluded as follows: "The circumstances surrounding the identification procedures by Mr. Lembeck at the Roxbury courthouse have not been shown in enough detail before me to demonstrate an illegality in those procedures. Nor has any illegality been demonstrated re the photograph[ic] identifications made by the witness . . . Lembeck . . .. However, even assuming the illegality of these procedures, I find that . . . the in-court identifications of all three defendants by the witness Lembeck are independent of the in-custody procedures and are therefore valid."

The judge ruled that the Commonwealth had satisfied its burden of proving the independence of the in-court identifications by "clear and convincing evidence" as *United States* v. *Wade, supra,* at 224, requires. There was an ample evidentiary basis to support the judge's conclusion.

We deal first with the pre-trial identifications of Ross and Daniels. While there may have been an element of suggestiveness in Lembeck's confrontations with the defendants at the Roxbury court house, we believe that the judge correctly emphasized Lembeck's prior opportunity to observe the men at the filling station earlier the same

morning. The pump area of the filling station was well lighted, and Lembeck could see the features of the three occupants clearly. Although he talked mainly with Daniels, he had some conversation with all three men, he was in their presence for approximately twenty minutes, and he leaned inside the automobile at one point and gave each man a cigarette. Later, he saw Daniels outside the automobile as he conversed with Lehane. The atmosphere during Lembeck's prolonged encounter with the trio was not casual, but gave Lembeck reason to feel uneasy and thus to be more conscious and aware of the men. The defendants argue that Lembeck did not describe the men in detail in either his oral or his written statement to the police; however, it is undisputed that the police did not ask for details and, in this circumstance, we attach no particular significance to the lack of a detailed description in Lembeck's statements.

In cases where there has been a suggestive in-custody identification, the determination whether to permit an identification at trial requires a consideration of a variety of factors. *United States* v. *Wade, supra,* at 241.[2] See *Gilbert* v. *California,* 388 U. S. 263, 272–274; *Commonwealth* v. *Cooper,* 356 Mass. 74, 84; *Commonwealth* v. *Wilson,* 360 Mass. 557, 561; *Commonwealth* v. *Mendes,* ante, 507, 511. The factors applied, however, depend upon their context, and every factor is not necessarily entitled to equal weight. See *United States* v. *Wade,* 388 U. S. 218, 241–242, n. 33; *Stovall* v. *Denno,* 388 U. S. 293, 302. If greater weight is given to any single factor, "[t]he extent of the witness' opportunity to observe the defendant at the time of the crime . . . seems the most important. Clearly the firmer the contemporaneous impression, the less is the witness subject

---

[2] The six factors enumerated in *United States* v. *Wade,* 388 U. S. 218, 241, were: "(1) The extent of the witness' opportunity to observe the defendant at the time of the crime; prior errors, if any, (2) in description, (3) in identifying another person or (4) in failing to identify the defendant; (5) the receipt of other suggestions, and (6) the lapse of time between the crime and the identification." *Allen* v. *Moore,* 453 F. 2d 970, 975 (1st Cir.).

to be influenced by subsequent events." *Allen* v. *Moore*, 453 F. 2d 970, 975 (1st Cir.). *Commonwealth* v. *Mendes*, *supra*. In the circumstances of the instant case, we are satisfied that Lembeck had ample opportunity to observe all three men at the filling station and that, as a result of his observations, he received a firm contemporaneous impression of each of them. We have considered the evidence bearing upon Lembeck's confrontations with Ross and Daniels at the Roxbury court house, and we conclude the judge correctly ruled that these confrontations were not so suggestive as to taint Lembeck's initial impression of the men. *Cooper* v. *Picard*, 428 F. 2d 1351, 1354 (1st Cir.), *S. C.* 316 F. Supp. 856, 859 (D. Mass.). See *Commonwealth* v. *McGrath, ante,* 431, 436–438. Compare *Foster* v. *California*, 394 U. S. 440, 442–443. For these reasons, we conclude there was sufficient basis for the judge's determination that the in-court identifications of Ross and Daniels had an origin independent of Lembeck's pre-trial confrontations with the defendants at the court house. See *Commonwealth* v. *Robinson*, 355 Mass. 620, 621–622; *Commonwealth* v. *Cooper, supra,* at 84–85; *Commonwealth* v. *Cefalo*, 357 Mass. 255, 257–258; *Commonwealth* v. *Balukonis*, 357 Mass. 721, 725; *Commonwealth* v. *Wilson*, 360 Mass. 557, 561; *Commonwealth* v. *Tempesta, ante,* 191, 195. Compare *Commonwealth* v. *Kazonis*, 356 Mass. 649, 653.

We turn next to the claims of the defendants Ross and Williams concerning photographic identification procedures followed by the police. Both defendants point to the judge's finding that, of the photographs shown to Lembeck, "[o]nly the pictures of the three defendants . . . contained on the reverse side the names and other information concerning the subjects of the photographs." However, there was no finding, nor was there any evidence on which a finding could be based, that the witness saw the written material, much less was influenced by it. Furthermore, apart from this writing, the photographs were all of the same type and each showed a black male of approximately the same age as the defendants.

The defendant Williams also objects to the manner in which the photographs were shown. He notes that, when Lembeck viewed the photographs at the police station, an officer pointed to the picture of Williams and inquired about him by name, and that the witness then made a positive identification. While we might attach more significance to this episode if it had been Lembeck's first identification of Williams (see *United States* v. *Trivette,* 284 F. Supp. 720, 723 [D. D. C.]), we see little, if any, significance in the episode since the witness had already identified Williams on a prior showing, an hour earlier at the filling station, without any suggestion whatever from the police.

We agree with the judge that police procedures in connection with the photographic identifications were not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U. S. 377, 384. *Commonwealth* v. *Wilson,* 357 Mass. 49, 54. In any event, even if we were to assume that they were, we are satisfied that Lembeck's prior observations of Ross and Williams on the morning of the crime were "an independent source" for his in-court identifications. *United States* v. *Wade,* 388 U. S. 218, 242. See *Commonwealth* v. *Wilson,* 357 Mass. 49, 55; *Commonwealth* v. *McGrath, ante,* 431, 437–438.

We recognize that the objections of the defendant Williams to some extent relate to the absence of counsel at the various showings of photographs to Lembeck. As we understand the *Simmons* decision, however, it was expressly limited to due process considerations. No claim was made under the Sixth Amendment. *Simmons* v. *United States,* 390 U. S. 377, 383. The case of *Cox* v. *State,* 219 So. 2d 762 (Ct. App. Fla.), to which Williams directs our attention, involved a video taped lineup and is plainly distinguishable from the instant case on the facts. Nor do we believe that the showing of standard police identification photographs constitutes a State compelled "confrontation" or exhibition within *United States* v. *Wade,* 388

U. S. 218, 228. Cf. *Commonwealth* v. *Geraway*, 355 Mass. 433, 438–439. In this regard, we agree with the following statement from *United States* v. *Bennett*, 409 F. 2d 888, 899–900 (2d Cir.), cert. den. sub nom. *Haywood* v. *United States*, 396 U. S. 852, reh. den. 396 U. S. 949: "[T]o require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant . . . is not present would press the Sixth Amendment beyond any previous boundary. None of the classical analyses of the assistance to be given by counsel . . . [citations omitted] suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence even when . . . the defendant is under arrest; counsel is rather to be provided to prevent the defendant himself from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proferred. Many other aspects of the prosecution's interviews with a victim or a witness to a crime afford just as much opportunity for undue suggestion as the display of photographs; so, too, do the defense's interviews, notably with alibi witnesses. . . . [I]n [the] *Wade* [case] itself, the Court listed as one of the ways the prosecution might attempt to show that a witness' identification of defendant at trial was not the fruit of a lineup held in the absence of counsel a showing of 'the identification by picture of the defendant prior to the lineup,' 388 U. S. [218] at 241 . . . , which clearly implies that such identifications are permissible even when defendant's counsel is not present."[3]  See *United States* v. *Roth*, 430

---

[3] The majority of circuits of the United States Court of Appeals follow the approach of the Second Circuit in the *Bennett* case. See *United States* v. *Collins*, 416 F. 2d 696, 699–700 (4th Cir.), cert. den. sub nom. *Collins* v. *United States*, 396 U. S. 1025; *United States* v. *Ballard*, 423 F. 2d 127, 130–131 (5th Cir.); *United States* v. *Serio*, 440 F. 2d 827, 829–830 (6th Cir.), cert. den. sub nom. *Serio* v. *United States*, 404 U. S. 838; *United States* v. *Robinson*, 406 F. 2d 64, 67 (7th Cir.), cert. den. sub nom. *Robinson* v. *United States*, 395 U. S. 926; *United States* v. *Long*, 449 F. 2d 288, 301–302 (8th Cir.); *Allen* v. *Rhay*, 431 F. 2d 1160, 1166–1167 (9th Cir.), cert. den. 404 U. S. 834; *United States* v. *Edwards*, 433 F. 2d 357, 358 (9th Cir.); *United States* v. *Roustio*, 435 F. 2d 923, 924 (9th Cir.); *United States* v. *Williams*, 436 F. 2d 1166, 1169 (9th Cir.), cert. den. sub nom. *Williams* v. *United*

F. 2d 1137, 1140 (2d Cir.) (following the *Bennett* deci-
sion), cert. den. sub nom. *Roth* v. *United States,* 400
U. S. 1021.

2. Nor is there merit in the defendant Daniels's argu-
ment that the judge erred in permitting the victim Le-
hane to identify him at trial.    He raises objections to
police photographic identification procedures under *Sim-
mons* v. *United States,* 390 U. S. 377, which are similar
in nature to those of the defendant Williams just con-
sidered.    Lehane spoke with the man he identified as Dan-
iels, face to face at a distance of two feet, for two to three
minutes in a well lighted area of the filling station.    The
conversation (first about the inflated plastic rabbit and
later about "Eddie" at the School of Public Communica-
tions) was such to arouse Lehane's suspicions and to
cause him to scrutinize the man's appearance.    This man
was Lehane's principal assailant.    About three months
later at the district attorney's office, Lehane viewed the
same set of photographs as the witness Lembeck had seen
earlier.    There was, as we have stated, nothing sugges-
tive about these photographs apart from some writing on
the reverse side of four pictures in the set.[4]    At voir dire,
Lehane testified that he viewed the photographs face up,
and only after picking out Daniels, did he notice the writ-

---

*States,* 402 U. S. 912; *United States* v. *Fowler,* 439 F. 2d 133, 134 (9th
Cir.); *McGee* v. *United States,* 402 F. 2d 434, 436 (10th Cir.), cert. den.
394 U. S. 908; *Rech* v. *United States,* 410 F. 2d 1131, 1132 (10th Cir.),
cert. den. 396 U. S. 970; *United States* v. *Von Roeder,* 435 F. 2d 1004,
1010 (10th Cir.).    But see *United States* v. *Zeiler,* 427 F. 2d 1305,
1307 (3d Cir.); *United States* v. *Ash,* 461 F. 2d 92, 99–105, (D. C.
Cir.) (en banc, 5–4) (10 cr. L. Rep. 2408).    Decisions in ten States ac-
cord with the *Bennett* case. *People* v. *Lawrence,* 4 Cal. 3d 273.   *Reed* v.
*State,* 281 Atl. 2d 142, 145–146 (Del.).   *Staten* v. *State,* 248 So. 2d 697
(Ct. App. Fla.).    *People* v. *Martin,* 47 Ill. 2d 331, 336, cert. den. sub
nom.   *Martin* v. *Illinois,* 403 U. S. 921.   *Smith & Samuels* v. *State,* 6
Md. App. 59, 64.   *Crenshaw* v. *State,* 13 Md. App. 361, 365–370.   *Steven-
son* v. *State,* 244 So. 2d 30, 33 (Miss.).   *State* v. *Brookins,* 468 S. W.
2d 42, 47 (Mo.).   *State* v. *Accor,* 277 N. C. 65, 80–81.   *State* v. *Searcy,*
4 Wash. App. 860, 861–864.   *Kain* v. *State,* 48 Wis. 2d 212, 218–219.
Decisions in two States are contra.   *Thompson* v. *State,* 85 Nev. 134,
137–138.   *Commonwealth* v. *Whiting,* 439 Pa. 205, 209, cert. den. sub
nom.   *Pennsylvania* v. *Whiting,* 400 U. S. 919.

[4] The photographs of the fourth man arrested with the defendants on
the morning of the crime, as well as those of the defendants, each bore
the name of the subject and other data on its reverse side.

ing on the back of some of the pictures. No police were present during the viewing, and although Lehane knew the set contained pictures of all his assailants, he declined to identify any but the photographs of Daniels. Had the writings influenced him, a different result might ensue. While it is true he had seen a newspaper photograph showing Daniels and the man arraigned with both Ross and Daniels, significantly he picked out only Daniels's picture among those he viewed at the district attorney's office.

In these circumstances, the judge was correct in concluding that there was nothing in the photographic identification procedures sufficient "to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U. S. 377, 384. Further, regardless of any possible suggestiveness in the photographic viewing,[5] we conclude that the observations of Lehane on the morning of the crime fixed in his mind the features of his principal assailant and provided at trial "an independent source" for his identification of Daniels. *United States* v. *Wade,* 388 U. S. 218, 242. See *Commonwealth* v. *Wilson,* 357 Mass. 49, 55; *Commonwealth* v. *McGrath, ante,* 431, 437–438.

3. We come next to the argument by the defendant Ross that there was error in the admission of testimony by Lembeck that he observed the defendant make an inculpatory gesture while at the Roxbury court house. Ross contends that the evidence of the inculpatory gesture was the direct result of an illegal pre-trial confrontation and was therefore inadmissible under *Gilbert* v. *California,* 388 U. S. 263, 272–273. We do not agree.

It is undisputed that police officers brought Lembeck to the court room at the Roxbury District Court between nine and ten o'clock on the morning of the crime. There

---

[5] To the extent, however, that the defendant Daniels relies on the Sixth Amendment, we reject his claim without qualification. For the reasons stated, *supra,* we are of the opinion that the right to have counsel present does not extend to showings of standard police identification photographs.

were approximately twelve black males, including the defendants Ross and Daniels, in a wire enclosure visible from the court room. Lembeck testified that, without encouragement from police, he "looked around on . . . [his] own," and that when no police were present, the defendant Ross placed the forefinger of his right hand vertically to his lips while at the same time making a "peace sign" (first and second fingers forming a "V") with his left hand. According to Lembeck, the police at no time pointed to, nor did they ask him to identify, any of the men in the enclosure. He picked out the defendants Ross and Daniels in his own mind, but he did not tell the police until later.

The right to have counsel present attaches at every "critical stage" of a criminal case where the State exhibits the defendant to the victim of the crime or to potential witnesses against him. *Commonwealth* v. *Cooper,* 356 Mass. 74, 80–83. *Commonwealth* v. *Guillory,* 356 Mass. 591, 592–593. *Commonwealth* v. *Wilson,* 357 Mass. 49, 55–56. See *United States* v. *Wade,* 388 U. S. 218, 236–237; *Gilbert* v. *California, supra,* at 272. See also *Simmons* v. *United States,* 390 U. S. 377, 382–383; *Foster* v. *California,* 394 U. S. 440, 442; *Coleman* v. *Alabama,* 399 U. S. 1, 7. The defendant Ross makes much of the fact that the police brought the witness to the court room in order to view the arraignments and, if possible, to identify the suspects. However, even if we agreed that this factor sufficiently indicates a State compelled confrontation, we perceive no constitutional error in the admission of Lembeck's testimony concerning the defendant's gesture to him. While pre-indictment lineup may be a "critical stage" within the meaning of the *Wade* case (see *Commonwealth* v. *Cooper, supra; Mason* v. *United States,* 414 F. 2d 1176, 1178–1181 [D. C. Cir.]), we do not believe that lack of counsel is determinative in the present circumstances. The purpose of the *Wade* case, as the defendant Ross himself states, is to provide the accused, through the presence of counsel, with an adequate basis at trial to recount any unfairness in pre-trial police

identification procedures and to enable an informed cross-examination of identification witnesses. *United States* v. *Wade, supra,* at 232. It is difficult, however, to see the relevance of this protection in the present situation where, prior to arraignment, the defendant Ross signalled the witness from the detention pen. The gesture was a voluntary act and in no sense the result of police exploitation. Thus, even assuming arguendo the illegality of the witness's observation of the lockup, we are nonetheless satisfied that evidence of the inculpatory gesture came "by means sufficiently distinguishable to be purged of the primary taint" of the lockup identification. *Wong Sun* v. *United States,* 371 U. S. 471, 488. See *Gilbert* v. *California, supra,* at 272–273.

Furthermore, we believe the Supreme Court never intended that the *Wade* decision should protect a criminal defendant from an inculpatory communication, whether by word or by gesture, if the communication is voluntary. The prohibition against pre-trial identification without notice and without counsel depends on the Sixth Amendment and not on the Fifth Amendment. In *United States* v. *Wade, supra,* at 222, the court said: "We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have." See *Commonwealth* v. *Cooper,* 356 Mass. 74, 82. If the defendant's gesture created a "critical" situation for him, responsibility rests with the defendant and not with the Commonwealth. In the absence of this voluntary gesture on the defendant's part, it is clear that the judge would have suppressed Lembeck's identification of the defendant in the detention area, in its entirety, just as he suppressed the later identification at his arraignment. In the circumstances, the defendant cannot now complain that his own voluntary conduct deprived him of his constitutional rights. Nothing was done or said to the defendant which

compelled his act of self-incrimination. In any event, even if the defendant's lawyer had been present in the court room, we fail to see what protection his mere presence would have afforded the defendant. "No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented." *Schmerber* v. *California*, 384 U. S. 757, 766. This is the logical rationale unless we require that counsel must be with a defendant at all times and places (including the "dock") so that he may advise him not to incriminate himself by gesture to those who may be witnesses against him. We do not believe the Fifth Amendment protection against self-incrimination can be carried to such an extreme. See *Miranda* v. *Arizona*, 384 U. S. 436, 474.

4. The defendant Ross contends that the judge erred in admitting in evidence against all the defendants certain paper money, covered with bloodstains, which the police took from the defendant Daniels while making an inventory of his possessions at the police station. Ross argues that admission of the money was error because it was the fruit of an illegal search and seizure and, also, because it was alternatively irrelevant or prejudicial in the circumstances of this case.

We consider the defendant's nonconstitutional ground first. "The relevancy of . . . [evidence] depends upon the question, whether it has a rational tendency to prove the issues made by the pleadings or other incidental material issues developed in the course of the trial." *Commonwealth* v. *Durkin*, 257 Mass. 426, 427–428. The fact that there was no testimony as to the type of the blood on the paper money goes to the weight and not to the admissibility of the evidence. The victim Lehane testified that the defendant Daniels and two other black men had stabbed and robbed him, that he had bled profusely, and that a five dollar bill was among the property taken from him. Also, there was testimony that the paper money was found not within the compartment of the defendant Daniels's wallet but rather inserted loosely inside the fold. Further, the testimony of the witness Lembeck placed the

defendants Ross and Williams as well as the defendant Daniels at the scene of the crime. We conclude, therefore, that the paper money had probative value because, together with other evidence, it tended to establish the fact of robbery and to constitute a link between all three defendants and the crime. See *Commonwealth* v. *Abbott*, 130 Mass. 472, 473; *Commonwealth* v. *Durkin, supra*, at 428; *Commonwealth* v. *Norton*, 339 Mass. 592, 594; *Commonwealth* v. *Palladino*, 346 Mass. 720, 726; *Commonwealth* v. *White*, 353 Mass. 409, 419. There is no merit to the contention by the defendant Ross that the blood tainted paper money was so inflammatory as to be inadmissible. See *Commonwealth* v. *Stirling*, 351 Mass. 68, 71–72.

Inasmuch as the Commonwealth does not contest Ross's standing, we proceed to the merits of his claim of constitutional error with reference to the paper money. In denying his motion to suppress made under *Mapp* v. *Ohio*, 367 U. S. 643, the judge ruled as follows: "The procedure which gave rise to the seizure . . . [of the paper money] was not a search within the Constitutional prohibitions raised by this motion, but instead was a mere inventory of the suspect's effects within the unvarying police procedures, for the purpose of protecting the valuables of the suspects and removing from them any property which could be instruments for suicide or self-injury by prisoners." [6] The judge made subsidiary findings, fully supported by the evidence, which may be summarized as follows: After arresting the defendants Ross, Daniels, and Williams and a fourth man, the police took the suspects to the police station for booking. There, as a

---

[6] The judge also made a second ruling that "even if the procedure at the police station were construed to be a search within the Constitutional prohibitions raised by the motion, the events at the police station constituted a reasonable and lawful continuation of the hasty and permissible search of the suspects which was conducted at the time and place of the arrests and which was temporarily suspended for good and necessary reasons of security, and was then continued at the police station after a lapse of only about seven minutes." In view of our holding, *post*, we find it unnecessary to review this second ruling.

part of normal booking procedures, an inventory was made of their possessions. The paper money later sought to be suppressed became visible simultaneously to two officers when one officer slid Daniels's wallet across a sloping booking desk to the other officer and the fold in the wallet opened and three loose bills emerged from the fold. The officers seized the bills when they observed what appeared to be bloodstains on two of them. At this time, they were aware that there had been an armed robbery, although they did not know the amount of money allegedly taken from the victim. There was no error.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge* v. *New Hampshire*, 403 U. S. 443, 465. These circumstances include a requirement that discovery of the evidence be inadvertent and incident to legitimate police activity. *Id.* at 465–471. See *Commonwealth* v. *Haefeli, ante,* 271, 281–282; *Harris* v. *United States*, 390 U. S. 234, 236. There must, in addition, be "a nexus . . . between the item to be seized and criminal behavior." *Warden* v. *Hayden*, 387 U. S. 294, 307. In the instant case, as the defendant Ross concedes, there is no question that the pre-incarceration inventory of possession was a legitimate police function. On the evidence, an ultimate finding was warranted that the paper money seized came into plain view through inadvertence and during routine, legitimate police work. See *Westover* v. *United States*, 394 F. 2d 164 (9th Cir.). Compare *Brett* v. *United States*, 412 F. 2d 401, 405–406 (5th Cir.) ; *United States* v. *Jones*, 317 F. Supp. 856, 858 (E. D. Tenn.).[7] Finally, the bloodstains on two of the bills, and the suspicious location of these bills outside the compart-

---

[7] Furthermore, there was no evidence here, as there was in the *Jones* case (at 857), that police went through the compartments of the suspect's wallet. Even if this had been the case, however, it would have been open for the Commonwealth to show that it was necessary to count the money in the suspect's wallet in order to give the suspect an accurate receipt and thereby to ensure the safety of his valuables. This justification was apparently not considered in the *Jones* case. See p. 858.

ment of the wallet, provided sufficient nexus between the paper money and the armed robbery to provide probable cause for the seizure. See *Commonwealth* v. *Haefeli, supra,* at 282–283. For these reasons, we cannot say that it was improper in the circumstances of this case for the police to seize the paper money without first obtaining a search warrant.

5. The defendant Ross asserts that the judge's failure to ask the veniremen specific questions drawn by the defendant on the subject of racial prejudice deprived him of the right to an impartial jury. We said in *Commonwealth* v. *Nassar,* 354 Mass. 249, 253–254: "In accordance . . . with our long standing practice, inquiry of prospective jurors was only by the judge. A trial judge is required only to ask those questions prescribed by statute or court decision. Other questions are in his discretion. . . . [citations omitted] There is ample power in this court to review whether a trial judge has committed any abuse of discretion in refusing to put additional questions, or otherwise to test members of the venire for bias or interest." Upon his probing the subjects required by law (see G. L. c. 234, § 28), he was satisfied that the jurors could render a fair and impartial verdict. There was no abuse of discretion, let alone any constitutional error.

*Judgments affirmed.*