COMMONWEALTH *vs.* JAMES ROSS, JR.

Suffolk.    April 2, 1973. — May 29, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Examination of jurors, Fair trial.    *Constitutional Law,* Due process of law.

Where it appeared that a defendant who was black was convicted in the Superior Court of armed robbery of a white man and assault by means of a dangerous weapon with intent to murder and assault and battery by means of a dangerous weapon upon him, that the trial judge was meticulously careful in questioning the veniremen upon their bias and prejudice and took great pains to insure that veniremen who expressed doubts about their ability to be impartial were excluded from the jury, and that there was nothing to show that the defendant was a target for racial prejudice beyond the fact that he was black and the victim was white, it was held that the decision in *Ham* v. *South Carolina,* 409 U. S. 524, did not constitutionally require the trial judge in the instant case to question prospective jurors specifically concerning their possible racial prejudices beyond the general comments and questions that were put to them relative to bias.    [666–673]

INDICTMENTS found and returned in the Superior Court on March 25, 1970.

There was a rehearing by the Supreme Judicial Court pursuant to an order of the Supreme Court of the United States.

*Michael G. West* for the defendant.

*Gerald F. Muldoon,* Assistant District Attorney (*James M. McDonough,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

*Robert H. Quinn,* Attorney General, & *Jeremiah O'Sullivan,* Assistant Attorney General, amici curiae, submitted a brief.

TAURO, C.J.   This case is here pursuant to an order entered by the United States Supreme Court [1] granting the defendant's petition for certiorari, vacating the judgment affirming his conviction (*Commonwealth* v. *Ross*, 361 Mass. 665) and remanding the case to us for further consideration in the light of *Ham* v. *South Carolina*, 409 U. S. 524.   Thus, the only issue we must decide is whether the *Ham* decision requires that the defendant's conviction should be reversed on the ground that the trial judge refused to ask the veniremen whether they were racially prejudiced.

In the *Ham* case, the defendant's conviction for possession of marihuana had been affirmed by the South Carolina Supreme Court.   The young black defendant had lived most of his life in Florence County, South Carolina, and was well known locally for his civil rights activities.   He had never previously been convicted of a crime and his basic defence was that the law enforcement officers were "out to get him" because of his civil rights work.   The posture of the case thus placed great emphasis on the issue of the credibility of the defendant in light of his reputation as opposed to that of the credibility of the police.

Prior to trial, Ham's counsel requested the judge to ask the prospective jurors four questions, two of which [2] sought to discover any possible racial prejudice.   The judge put three general questions to the prospective jurors concerning possible bias, prejudice and partiality, as required by the State statutes,[3] but declined to ask the questions requested by the defendant.

---

[1] Ross *vs.* Massachusetts, 410 U. S. 901.

[2] These two questions were: "1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?   2. You have no prejudice against negroes?   Against black people?   You would not be influenced by the use of the term 'black'?" 409 U. S. at 525, fn. 2.

[3] S. C. Code § 38–202 (1962).   The questions were, in substance, the following: "1. Have you formed or expressed any opinion as to the guilt or innocence of the defendant, Gene Ham?   2. Are you conscious of any bias or prejudice for or against him?   3. Can you give the State and the defendant a fair and impartial trial?" 409 U. S. at 526, fn. 3.

The Supreme Court of the United States reversed Ham's conviction holding that "the Fourteenth Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice." 409 U. S. at 527. Although the court's opinion stated that "the trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by . . . [the defendant]," the court decided that once the State had "created . . . [a] statutory framework for the selection of juries, the essential fairness required by the Due Process Clause of the Fourteenth Amendment requires that under the facts shown by this record the . . . [the defendant] be permitted to have the jurors interrogated on the issue of racial bias." 409 U. S. at 527.

The defendant Ross was convicted in the Superior Court for armed robbery, assault by means of a dangerous weapon with intent to murder, and assault and battery by means of a dangerous weapon, and was sentenced to imprisonment in the Correctional Institution at Walpole to serve three lengthy concurrent terms.

The judge denied the defendant's request to ask the prospective jurors a specific question designed to elicit possible racial prejudice.[4] The three lawyers represent-

---

[4] The defendant requested the judge to ask the veniremen seven questions. Only one of these questions is presently before us as touching upon racial prejudice: "5. Are there any of you who believe that a white person is more likely to be telling the truth than a black person?" The defendant was tried with two other codefendants named Daniels and Williams, both of whom submitted similar questions which were also rejected by the judge. After Ross's conviction had been affirmed by this court, he filed a petition for writ of certiorari to the United States Supreme Court stating that "each defense counsel submitted motions to the judge which proposed questions to be asked to the jurors concerning the issue of racial prejudice." There was then set forth a list of questions headed by the defendant's question numbered 5, and followed by questions numbered 3, 4, 6–10 submitted by the defendant Daniels and questions numbered 10–19 submitted by the defendant Williams. Ross's brief on rehearing now refers to his own question 5, Daniels's question 3–16 and Williams's questions 10–19. The Commonwealth properly argues that Ross cannot base assignment of error on the judge's failure to ask the questions submitted by Daniels and Williams because Ross never, by motion or otherwise, adopted those questions as his own. Nevertheless, we think that Ross's own question numbered 5 is sufficient to raise the issue of the judge's failure to ask the veniremen a question (or questions) specifically designed to uncover possible racial prejudice.

ing the defendant and the two codefendants who were tried with him [5] were concerned about the veniremen's possible prejudice in two specific areas: (1) possible racial prejudice because the defendants were black and (2) possible lack of impartiality because the victim was a Boston University security guard or "quasi policeman." The judge recognized both these concerns as problems. He agreed to ask the veniremen whether they had ever done police work or whether they had any relatives in such work. [6] It is not argued that such a question failed to protect the defendants from possible bias on this matter, and this aspect of possible lack of impartiality is not before us.

Although the judge declined to ask the veniremen whether they were prejudiced against black people, he decided, "in the interest of good sense," not to mention the defendants' Muslim names appearing on the indictments, but only to refer to them as Ross, Daniels and Williams. The judge carefully weighed the likelihood of discovering bias by means of questions concerning racial prejudice and came to the conclusion that it would be most unusual for such questions to reveal any such prejudice. [7] He explained to the veniremen with clarity that

---

In his petition for certiorari to the Supreme Court, Ross insists that the facts in the *Ham* case "exhibit considerable similarity with the case at bar." Actually, the only similarity is that Ham and the defendant Ross are black. The petition for certiorari carefully avoids the additional facts in the *Ham* case (that Ham was well known for his civil rights activities and that he claimed that the police were "out to get him" because of his activities) which are nonexistent in the instant case. Conceivably, the Supreme Court may have considered similar circumstances to have existed in the *Ross* case in view of the allegations in the petition. Ross, in his petition, carefully excluded the judge's comments, remarks and questions addressed to the prospective jurors. For all that appears in the petition, the judge merely put the statutory questions to the jury — and no more.

[5] The defendant Ross was represented by Mr. Newman, the defendant Williams was represented by Mr. Owens and the defendant Daniels was represented by Mr. Donnelly.

[6] Question: "Are you presently, or have you in the past worked for a police department or District Attorney's office, or do you have any relative or relatives who is or was engaged in such work?"

[7] The colloquy between the judge and the defence counsel on this matter was as follows:

THE JUDGE: "All right. I am going to approach it, as I have said, with all due respect to the problems, and they are important problems

they must let the court know if for any reason they could not try the case impartially, without bias or prejudice

which you gentlemen have raised with these several questions which you have asked the Court to put in addition to the usual statutory inquiry, and without going into the details as to my reasons, I feel that no purpose would be accomplished by asking such questions in this instance.

"There are a number of reasons why I take that position, but they are sound reasons, and the reason I asked you in is that I thought from something Mr. Donnelly said, he might have wanted on the record something which was peculiar to this case, or peculiar to the circumstances which we are operating under here which perhaps he didn't want to say in open court.

"Is there anything peculiar about it, Mr. Donnelly?"

COUNSEL FOR THE DEFENDANT DANIELS: "No, just the fact that the victim is white, and the defendants are black."

THE JUDGE: "This, unfortunately, is a problem with us, and all we can hope and pray for is that the jurors and all of them take their oaths seriously and understand the spirit of their oath and understand the spirit of what the Court says to them — this Judge anyway — and I am sure all Judges of this Court — would take the time to impress upon them before, during, and after the trial, and before their verdict, that their oath means just what it says, that they are to decide the case on the evidence, with no extraneous considerations.

"I believe that that is the best that can be done with respect to the problems which — as I said, I regard as extremely important, but at the same time, my attitude —"

COUNSEL FOR THE DEFENDANT DANIELS: "There is only one thing. The only reference I would make to the facts in this case — the victim being white, and that he was a security guard in uniform and acting as a policeman."

COUNSEL FOR THE DEFENDANT ROSS: "I think that factor might suggest the question — this was my series of questions — asking the jurors whether any of their relatives are policemen."

THE JUDGE: "I will be frank with you; I have done that on the juror-by-juror voir dire in a capital case. I have never done it in anything short of a murder case."

COUNSEL FOR THE DEFENDANT ROSS: "This can be done short of juror-by-juror, just by stating that."

THE JUDGE: "I appreciate that."

COUNSEL FOR THE DEFENDANT WILLIAMS: "In behalf of James Williams, I have various questions before the Court right now, as to impartiality, and I understand the Court's position, but I would request the Court to just make general inquiry of the entire panel because whenever you have a situation involving black and white, by way of witnesses, a black witness testifying, and black, as to whether or not these jurors are impartial —"

THE JUDGE: "Let me say, again with the greatest respect for the problem, which is an acute problem, and always will be an acute problem in the courtroom and in the trial of a case involving possible racial prejudice, but one of the things that I say, and it is not the complete reasoning process that I apply to it in terms of orderly and fair administration of the Court, but one of the things I say is that I would be simply astonished if I ever asked a juror, or a group of jurors, or even heard a lawyer ask a group of jurors if they are white, 'Are you biased against black,' if they are white, or if they are black, 'are you biased against white.' I would be simply astonished if I had an affirmative answer. The man who has the disease of bias would be the last one that would admit it."

or if they had already formed an opinion.[8]   He pointed out that "your oath requires . . . that any verdict that you return must be a fair and impartial verdict based upon the evidence and not based upon any extraneous factors, not based upon any bias or prejudice or preconceived notion or any other experience factor." The veniremen were told that they must raise their hands "[i]f, for any reason, you conclude that you cannot render a fair and impartial verdict, or if you doubt whether you can render a fair and impartial verdict."

It is clear that at least one of the prospective jurors understood that the questions put to him about his prej-

_____

COUNSEL FOR THE DEFENDANT WILLIAMS: "Your Honor, just recently I tried that civil rights case before Judge Julian which lasted four weeks, and some of the same questions we asked the entire panel, and I think 20 raised their hands when the Judge asked them certain questions, if they were biased or prejudiced."

THE JUDGE: "I am astonished at that.  It is contrary to all of the experience that I have had."

COUNSEL FOR THE DEFENDANT DANIELS: "I tend to agree with you that people like to be good, and racism is bad, but if you ask people in the community, 'Can you be impartial?'  They will say they can be. The thrust of these questions is designed to help the jurors as well as the Court to bring out within themselves the fact that they might not have considered it themselves."

THE JUDGE: "I am going to adopt Mr. Newman's suggestion that we have a double problem here, not only the problem of skin color, but we also have the problem of someone who is a quasi policeman, so I am going to ask a third question, and that is, — and it is a question some of the other Superior Court Judges are allowing in the area of relations to police — 'Are you presently or have you in the past worked for a police department or a District Attorney's office, or do you have any relative or relatives who is or was engaged in such work?'

"I know there are one or two judges that have gone much further than that, but most will go no further than that."

[8] General Laws, c. 234, § 28, provides: "Examination of jurors. Upon motion of either party, the court shall or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection.  If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead."

Apart from the question concerning police affiliations, the veniremen were asked (a) "[i]f any of you are related to the defendants or to the victim or if any of you have any interest in this case or expressed or formed an opinion or is sensible of any bias or prejudice, please make it known to the Court at this time," and (b) "[i]s there any serious reason why you cannot serve upon this jury, considering that you will be locked up, sequestered, living in a hotel away from your home for about a week?"

udice or bias included racial prejudice. The defendants were asked to stand up so that the veniremen could see them. The clerk then asked the veniremen the questions outlined by the judge and various other questions previously explained to them but not in dispute here. In answer to the clerk's questions, several prospective jurors raised their hands to indicate possible bias. Those who indicated that they might be biased, prejudiced or had already formed an opinion of the defendants' guilt were then questioned individually by the judge. One prospective juror was excused because of admitted racial prejudice and two were excused for an unspecified prejudice. Seven prospective jurors were excused because they had already formed an opinion, seven were excused because of connections with police work, and one was excused because of his affiliation with the university where the alleged crimes occurred. The final composition of the jury of twelve was ten white persons and two black persons.[9]

Ross asserts that the similarities between his case and the *Ham* case are sufficient to bring him within the rule of that case. We cannot agree. We do not believe that the *Ham* case announced a new broad constitutional principle requiring that questions, designed to discover possible racial prejudice, be put to prospective jurors in all State criminal trials when the defendant is black (or from some other racial minority group), even when the defendant has requested such an inquiry and the statutory framework permits questioning to discover bias.

Mr. Justice Rehnquist, writing for the Supreme Court, was careful to limit the language of the court's opinion to the special circumstances of the case under consideration. The court stated: "[W]e think that the Fourteenth Amendment required the judge *in this case* to interrogate the jurors upon the subject of racial prejudice" and more specifically that "the essential fairness required by the

---

[9] The Commonwealth had thirty-one unused peremptory challenges left at this point. See G. L. c. 234, § 29, as amended through St. 1963, c. 187.

Due Process Clause of the Fourteenth Amendment requires that *under the facts shown by this record* the petitioner be permitted to have the jurors interrogated on the issue of racial bias" (emphasis supplied). 409 U. S. at 527. In reaching its decision, the Supreme Court relied upon *Aldridge* v. *United States,* 283 U. S. 308, but we believe that the precedent of the *Aldridge* case, which appears to have been given constitutional dimensions, is to be limited to special circumstances as indicated by the *Ham* case.

As we noted previously, Ham was well known for his civil rights work in the locality where he was tried. The very activities that brought him to public attention specifically focused upon the issue of racial prejudice and Ham raised this matter by claiming that the police were "out to get him" because of his activities.[10] To those members of the jury who might have been prone to racial bias, the defendant Ham would have been a prominent target for their prejudice.

In the instant case, however, there was nothing that pointed to Ross as a special target for racial prejudice. The trial judge addressed the attorneys for the defendants and the Commonwealth in the lobby of the court room and stated that he "thought from something Mr. Donnelly [representing Daniels] said, he might have wanted on the record something which was peculiar to this case, or peculiar to the circumstances which we are operating under here which perhaps he didn't want to say in open court." He then asked, "Is there anything peculiar about it, Mr. Donnelly?" to which Mr. Donnelly replied, "No, just the fact that the victim is white, and the defendants are black." The attorney for Ross, who was present at the lobby conference, did not bring any other special circumstances to the judge's attention and we assume that there were none.

---

[10] As we have previously noted, this was Ham's principal defence and thus his credibility as opposed to that of the police was crucial. This issue was not explicitly raised in the instant case. Actually, Ross did not take the stand in his own defence and therefore his credibility was not before the jury.

We hold, therefore, that the *Ham* decision does not, in this case, dictate that the trial judge was constitutionally required to question prospective jurors specifically concerning their possible racial prejudices beyond the comments and questions that were put to them. While the due process clause of the Fourteenth Amendment requires the States to insure the essential demands of fairness in criminal trials, we believe that the judge's refusal to ask specific questions designed to discover racial prejudice of the veniremen did not, in this case, violate the defendant's right to the demands of fairness. Contrary to the judge in the *Ham* case, the judge in the instant case expressly recognized the relevance and importance of the problem. He was meticulously careful in questioning the veniremen upon their bias and prejudice and took great pains to insure that veniremen who expressed doubts about their ability to be impartial were excluded from the jury. We believe that the judge's questions and comments to the veniremen were, in these circumstances, commensurate with the requirements of the Fourteenth Amendment.

Although we hold that the judge's examination of the prospective jurors meets the essential demands of fairness in this case, we perceive that it will be unusual for a trial judge to understand fully the dimensions of a case before he has heard it. The issue of racial prejudice may not be apparent at the outset of a case but may become evident during the trial. Therefore, when a defendant requests that the prospective jurors be questioned about their racial prejudice, the judge should make specific inquiries of counsel concerning the racial aspects of the case. Such an inquiry was properly made in the instant case.[11] If it appears from such preliminary inquiries that the case might reasonably be expected to present factors involving possible racial prejudice, then the judge should question the prospective jurors in this area. In such circumstances, it is within the trial

[11] See fn. 7, *supra.*

judge's discretion to determine the precise format of the questions to be asked, provided the inquiry is "sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain." 409 U. S. at 527.

*Judgments affirmed.*