James ROSS, Jr., Petitioner-Appellee,

v.

Theodore RISTAINO et al.,
Respondents-Appellants.

No. 74–1222.

United States Court of Appeals,
First Circuit.

Dec. 31, 1974.

Dennis J. LaCroix, Deputy Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief Crim. Div., were on brief, for respondents-appellants.

Michael G. West, Springfield, Mass., by appointment of the Court, with whom Kamberg, Berman & Hendel, P. C., Springfield, Mass, was on brief, for petitioner-appellee.

Before COFFIN, Chief Judge, McENTEE, Circuit Judge, and MOORE,* Senior Circuit Judge.

McENTEE, Circuit Judge.

We are required in this case to decide whether it was a denial of due process, where the defendant was a black man accused of violent crimes against a white security officer, for a state court judge to deny a defense request to interrogate prospective jurors specifically on the issue of racial prejudice.[1]

The Commonwealth of Massachusetts appeals from a memorandum and order entered by the district court granting a writ of habeas corpus to appellee, who was convicted of armed robbery, assault and battery by means of a danger-

---

* Of the Second Circuit sitting by designation.

1. The defendant's motion for examination of proposed jurors asked that various questions be put to the *voir dire* panel. The question which this litigation involves was "Are there any of you who believe that a white person is more likely to be telling the truth than a black person?"

ous weapon, and assault and battery with intent to murder. The Massachusetts Supreme Judicial Court unanimously affirmed these convictions, Commonwealth v. Ross, 1972 Mass.Adv.Sh. 873, 282 N.E.2d 70, but the United States Supreme Court granted certiorari, vacated the judgment and remanded the case for further consideration in light of Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). Ross v. Massachusetts, 410 U.S. 901, 93 S.Ct. 968, 35 L.Ed.2d 265 (1973). On remand the Supreme Judicial Court held that *Ham* did not affect the result reached in its earlier deliberation, Commonwealth v. Ross, 1973 Mass.Adv.Sh. 839, 296 N.E.2d 810.[2] Ross sought a writ of habeas corpus from the district court, which the court granted, saying:

"The questions propounded to the jurors in the present case were directed to the general issue of bias and prejudice, and were far more extensive and carefully worded than those given in Aldridge [v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931),] and *Ham*. They were exemplary in every respect, except the failure to specifically direct the attention of the jurors to the issue of racial prejudice. In substance, they were no different than the ones given in *Ham*. The fact that one juror responded that he suffered from racial prejudice and was excused does not cover the situation, because his perception cannot be imputed to the twelve who were chosen.

"In the instant case, there was a white victim. The offense in *Ham* was victimless, i. e., possession of marijuana. The likelihood of infection of the verdict was at least as great as it was in *Ham*. . . . The petitioner had a constitutional right to have the issue of racial prejudice specifically called to the attention of the prospective jurors on the *voir dire* examination."

In Ham v. South Carolina, *supra,* the defendant was a black civil rights leader charged with possession of marijuana. His defense was that the police were out to get him and were framing him on the drug charge. His counsel requested the judge to ask on *voir dire* two questions designed to ferret out any possible racial prejudice against the defendant.[3] The judge did put three general questions to the prospective jurors on the issue of bias, but he refused to ask any question directed specifically to racial prejudice. The Supreme Court, in a unanimous opinion, held "that the Fourteenth

**2.** After the decision of the Massachusetts Supreme Judicial Court on remand, Ross again filed a petition for certiorari with the United States Supreme Court. The Court denied the petition, Ross v. Massachusetts, 414 U.S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486 (1973), but Justice Marshall filed an opinion, in which Justices Douglas and Brennan joined, dissenting from the denial. This part of the procedural history of this case has no legal effect in this court. The denial of a petition for certiorari from a state court judgment affirming a conviction has no legal significance when an application for a writ of habeas corpus thereafter comes before a district court. Brown v. Allen, 344 U.S. 443, 488–497, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (opinion of Justice Frankfurter, for a majority of the Court). That only three Justices voted to grant Ross's second petition for certiorari does not mean that five or more Justices were voting, or even would have voted, to affirm on the merits the decision of the Massachusetts Supreme Judicial Court on remand. That the three dissenting Justices filed a lengthy opinion with the denial of certiorari does not reverse the effect to be accorded the denial; the opinion only indicates how strongly those Justices feel about the case. Denial of certiorari may be motivated, among other reasons, by a desire "to have different aspects of an issue further illumined by the lower courts," Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 918, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) (opinion of Justice Frankfurter respecting denial of certiorari), or by a preference for administrative reasons to have the prisoner seek habeas corpus in the district court. *See generally* R. Stern & E. Gressman, Supreme Court Practice §§ 5.4–5.7 (4th ed. 1969).

**3.** The two questions sought to be asked were:

"1. Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?

"2. You have no prejudice against negroes? Against black people? You would not be influenced by the use of the term 'black'?" 409 U.S. at 525 n. 2, 93 S.Ct. at 849.

Amendment required the judge in this case to interrogate the jurors upon the subject of racial prejudice." 409 U.S. at 527, 93 S.Ct. at 850. The contours of the *Ham* decision were not sharply defined by the Court. Justice Rehnquist's opinion did not explicitly state that whenever a black defendant requests the trial judge to inquire specifically on the issue of racial prejudice on *voir dire* the trial judge must do so. Nor did the opinion explicitly state that the defense request for specific questions directed to racial prejudice need only be honored where the defendant was a civil rights leader or other "special target of racial prejudice,"[4] which was the construction the Supreme Judicial Court gave *Ham*.[5] Commonwealth v. Ross, 1973 Mass. Adv.Sh. 839, 296 N.E.2d 810.

■ Under the view we take of the facts in this case, however, we are not required to resolve this ambiguity. In *Ham* the defendant was a civil rights leader, while in this case the black defendant is for the purpose of this inquiry an ordinary black citizen. But in this case, the charges against the defendant involved violence against a white, not a victimless crime like possession of mari-

juana. Moreover, the white victim, a security officer at Boston University, had a status close to that of a police officer. In addition, the eyewitness testimony of a white gas station attendant was a major part of the state's case against Ross. On these facts the district court was not in error in concluding that "[t]he likelihood of infection of the verdict [by racial prejudice] was at least as great as it was in *Ham*." In effect, the court held that a black defendant charged with violent crimes against a white security officer would be likely to be a special target of racial prejudice.

Our dissenting brother suggests that the rule of *Ham* should only apply to cases brought to trial after the date *Ham* was decided. However, we do not feel the writ should be denied on the ground that *Ham* should not be given retroactive application. The Supreme Court implicitly decided that *Ham* applied to this case when it summarily vacated the judgment of the Supreme Judicial Court of Massachusetts and remanded the case to that court for reconsideration in light of *Ham*. *See* Ross v. Massachusetts, 410 U.S. 901, 93 S.Ct. 968, 35 L.Ed.2d 265 (1973).

4. If a juror were prone to racial bias, we question whether it is reasonable to conclude that he would confine that bias, and its destructive effects on his impartiality, to cases where the defendant was a civil rights leader. That the juror might be particularly prone to vent his bias in such a case in no way supports the conclusion that he would be an impartial juror in the absence of such a special factor, as the due process clause requires, *see* Peters v. Kiff, 407 U.S. 493, 501, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (opinion of Justice Marshall).

5. Other state cases suggest any black criminal defendant, target or not, who requests a specific inquiry about racial prejudice is entitled to it. Cochran v. State, 505 S.W.2d 520 (Ark. 1974) (prosecution for assaulting an officer during an assemblage or riot); McNichols v. State, 279 So.2d 377 (Fla.App.1973) (state confessed error; facts not stated); Mize v. State, 131 Ga.App. 538, 206 S.E.2d 530 (1974) (black defendant charged with simple battery against white prosecutrix entitled to question on racial prejudice); Reid v. State, 129 Ga. App. 657, 200 S.E.2d 454 (1973) (error not to allow black woman charged with theft to

have questions concerning racial bias); People v. Wray, 49 Mich.App. 344, 212 N.W.2d 78 (1973) (black defendant charged with carrying concealed weapon in motor vehicle entitled to question all-white jury on racial bias); Shabazz v. State, 506 S.W.2d 60 (Mo. Ct.App.1974) (dictum); People v. Rubicco, 42 A.D.2d 719, 345 N.Y.S.2d 624 (2d Dept. 1973), aff'd on another ground, 34 N.Y.2d 841, 359 N.Y.S.2d 62, 316 N.E.2d 344 (1974) (possession of gambling records; "reversible constitutional error" to deny motion to ask jurors whether they are biased against Italians); People v. Williams, 41 A.D.2d 611, 340 N.Y. S.2d 504 (1st Dept. 1973) (narcotics convictions reversed because of "direct conflict with . . . *Ham*"). *But see* United States v. Walker, 491 F.2d 236 (9th Cir.), cert. denied, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 768 (1974) (prosecution for uttering forged U. `S. treasury check; inquiry about racial prejudice not mandated because no racial overtones shown); Commonwealth v. Brown, 228 Pa. Super. 166, 323 A.2d 281 (1974) (conviction for forcible rape affirmed by 3 to 2 vote; requested racial question held irrelevant and overbroad).

It is not a significant distinction between this case and *Ham* that Ham took the stand and put his credibility in issue, while Ross did not take the stand. If a juror is prejudiced against blacks, he would not be able to appraise the defense offered by the black defendant impartially, whether or not that defense included the defendant's taking the stand. Nor is it particularly relevant that the trial court here doubted that questions directed to discovering racial prejudice would result in any admissions of bias. This objection would apply equally well to other questions the court is required to put to proposed jurors. *See* Mass.Gen.Laws Ann. c. 234, § 28 (Supp.1974). For example, a proposed juror biased by pretrial publicity might aver he is not biased or a juror who believes anyone indicted is guilty as charged might answer that he believes the defendant is innocent until proven guilty, yet we do not allow the possibility of a false answer to serve as an excuse for not asking these questions.

█ By deciding in this case that the trial judge should have questioned the proposed jurors specifically on the question of racial prejudice, we do not hold that he had to ask the specific questions sought by Ross's counsel. "[T]he trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner." Ham v. South Carolina, *supra,* 409 U.S. at 527, 93 S.Ct. at 850. *See* Featherston v. United States, 491 F.2d 96 (5th Cir.), cert. denied, 417 U.S. 971, 94 S.Ct. 3176, 41 L.Ed.2d 1142 (1974). The trial judge has broad discretion as to the questions to be asked regarding racial prejudice.[6]

The writ of habeas corpus shall issue unless within 90 days from the date of this opinion the Commonwealth has either instituted proceedings to retry the petitioner or applied for a writ of certiorari. If certiorari is sought and granted, the issuance of the writ of habeas corpus shall be stayed pending further order of the Supreme Court. If certiorari is sought and denied, the writ of habeas corpus shall issue unless the Commonwealth has instituted proceedings to retry the petitioner within 30 days after the date certiorari is denied.

So ordered.

MOORE, Circuit Judge (dissenting).

The sole issue on this appeal relates to the *voir dire* examination of prospective trial jurors during which the trial judge denied a specific request on behalf of the petitioner, Ross, to ask a particular question, accurately stated by the majority as follows: "Are there any of you who believe that a white person is more likely to be telling the truth than a black person?" No question was sought by Ross' counsel addressed to prejudice against Ross as a black. Other questions addressed to prejudice against blacks were requested by co-defendants not involved on this appeal. In my opinion the request of Ross' counsel cannot be given the broad interpretation that the majority has given in saying that it was "a defense request to interrogate prospective jurors specifically on the issue of racial prejudice."

The majority hold, as did the District Court, that the failure of the trial judge to question "the proposed jurors specifically on the question of racial prejudice" amounted to a denial of constitutional due process. In so holding, they rely primarily on the recent Supreme Court decision in Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), although they concede that the *Ham* opinion "did not explicitly state that whenever a black defendant requests the trial judge to inquire specifically on the issue of racial prejudice on *voir dire* the trial judge must do so."

As for this and the other points made, we come to rest with the conviction that they would apply equally to the case presented in *Ham*.

---

**6.** We observe with respect to our brother's dissenting opinion that whenever trial judges are vested with broad discretion it is possible to evoke Pandora, but only if one assumes that discretion will be thrown to the winds.

*If* the District Court be correct in saying that "The petitioner had a constitutional right to have the issue of racial prejudice specially called to the attention of the prospective jurors on the *voir dire* examination." and *if* it was a "denial of due process" of constitutional dimension to deny a defense request to interrogate prospective jurors specifically on the issue of racial prejudice and *if* the District Court had no choice but to enter the order granting the writ of habeas corpus because "The mandate of *Ham* is so clear . . .", then, in my opinion, Pandora's box of potential evil has indeed been opened wide and I look with Cassandra-like foreboding upon the future of the *voir dire* jury examination in cases involving black defendants.

Starting with the question, which the majority quite accurately states this litigation involves, "Are there any of you who believe that a white person is more likely to be telling the truth than a black person?", I find no relation between such a question and the ultimate desideratum, namely, to uncover racial prejudice against a black defendant. Such a question could not be properly answered unless prosecution and defense read to the prospective juror the name and color of all witnesses they intended to call. Even then it would be impossible to obtain a juror's pre-trial commitment as to a witness' credibility until the particular witness had been seen and heard. Will it be constitutionally impermissive to deny interrogation as to a prospective juror's feelings as to the credibility of a witness of the "X" race, nationality or religion? Illustrative of the problem are questions proposed by petitioners' co-defendants:

"18. Do you have any feelings either for or against persons of the Black race who wear the Afro style haircut and long sideburns?" (App. p. 56) or

"7. Do you feel that this increase (in crime) is due primarily to blacks in the city?" and

"12. Do you object to the number of blacks and Puerto Ricans on the welfare rolls in the city?" (App. p. 58.)

The other forty questions sought to be asked by these co-defendants were undoubtedly intended in good faith by counsel to ferret out the more intimate prejudices of the panel which was to pass judgment on their clients but query, did not the state trial judge probe sufficiently deeply, as a practical matter, in inquiring "Can you under oath return a fair and impartial verdict based upon the evidence that you hear in the courtroom and not upon any extraneous factors; no bias or prejudice or personal interest in the case, and no prejudice of any kind." (App. p. 494.)

Petitioner argues that the state judge's failure to focus the attention of the prospective jurors as to any racial prejudice they might entertain is "as a matter of constitutional law" reversible error. If this is to be the rule by judicial legislation, in fairness to trial judges, state and federal, the rule should only be so promulgated for future cases.

The District Court concedes that the questions propounded on the general issue of bias and prejudice were exemplary in every respect "except the failure to specifically direct the attention of the jurors to the issue of racial prejudice." However, if there are to be rules they should be clear and capable of objective application. In other words, it is easy to understand and apply a rule which requires a trial judge in every case in which there is a black defendant to inquire of each individual juror whether he would be adversely prejudiced against such a person because of his race. But is the trial judge duty bound to ask such a question in the absence of a request? If he asks the question *sua sponte,* the appeal in all probability will be on the ground that he injected the racial issue into the case—hence reversible error. If he fails to ask the question, the same result will obtain and, if counsel fails to make the request, incompetence of counsel will be the charge on the habeas corpus application.

The importance of appellate pronouncements in the field of trial procedure is because of the guidance they should give to trial judges. What are we telling the trial judge as to how he should conduct the *voir dire* on the next trial so as to avoid constitutional error?

A "next" trial can be assumed. Only a few years have elapsed since the first trial. The witnesses and their whereabouts in all probability are known. The facts supporting guilt as found on the first trial may be read in the two opinions of the Massachusetts Supreme Judicial Court.[7] But juries, not courts, are to determine guilt or innocence and the method of selection of the jury will be the most important element initially.

Neither *Aldridge*,[8] *Ham, supra,* the District Court opinion nor this court's opinion will be of real value as guidelines. *Aldridge* and *Ham* indicate that questions regarding racial prejudice must be asked. And, although *Ham* and the majority state that the questions need not be "in any particular number" or form, *Ham,* 409 U.S. at 527, 93 S.Ct. 848, only an appellate court will be able to decide whether the future trial judge will have properly exercised that "broad discretion" with which appellate courts so liberally endow him.

If the courts are satisfied to accept "No" to the single question "Are you prejudiced against blacks?" and this colloquy is considered to be constitutionally sufficient, such a question should be permitted if counsel should choose to request it. But the courts are not so easily satisfied—and probably properly so. Few jurors will reveal the innermost workings of their minds—particularly in public. The mere "obtaining jurors' assurances of impartiality is insufficient [to test that impartiality]."[9] The courts have said that a prospective juror's eligibility "should not be adjudged on that juror's own assessment of self-righteousness *without something more.*"[10]

It is all very well to speak of a standard to be used in the exercise of discretion in passing upon requested inquiries as meeting "the essential demands of fairness." *Aldridge, supra,* 283 U.S. at 310, 51 S.Ct. 470, but, what these demands may be, will only be known to the trial judges years later in the opinion of some appellate court.

Take for example a single instance derived from this case because it falls into the category of the "something more" field of inquiry. A proposed question submitted to the trial judge here followed the questions: "Do you have children? Do they go to public schools?" and was:

"16. If in private schools, is this a result of your feelings towards the number of blacks and Puerto Ricans in the school system?"

In view of certain situations recently reported in the public press existing in Eastern Massachusetts with respect to the public schools such a question might well be included in a probing group, including "Are you at all nervous about walking the streets of your town or city after dark?" Almost unlimited questions along this line can be conjured up for obtaining a true picture of the potential juror's mind. To obtain such a picture the *voir dire* might well more properly be relegated to the psychiatrist.

However, our present concern must be this case. We are given some 120 pages of transcript devoted entirely to the trial judge's efforts to obtain an impartial jury. Successive panels were interrogated. The defendants who are black stood before the prospective jurors. The trial judge was most specific as to "bias or prejudice" generally. The jurors knew when asked about prejudice that the defendants were black. Each juror

---

7. Commonwealth v. Ross, 282 N.E.2d 70 (1972) and 296 N.E.2d 810 (1973).

8. Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

9. United States ex rel. Bloeth v. Denno, 313 F.2d 364 at 372 (2nd Cir. 1963), cert. denied, 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143.

10. Silverthorne v. United States, 400 F.2d 627, 639 (9th Cir. 1968). (Emphasis in original).

was given an opportunity to approach the Bench and express whatever his own personal reasons for not wishing to serve. Any possible reluctance to express racial bias or prejudice in public was thus avoided. In fact two jurors were excused because of prejudice; one in particular, because of racial prejudice. The ultimate jury consisted of 10 whites and 2 blacks. No incident has been pointed out to us which might indicate that this was not a normal and average American jury which heard the evidence and reached their verdict thereon. If there is to be a new *voir dire* rule, mandating upon request the injection of a racial prejudice issue into the case, I am not prepared to fault the trial judge for not knowing it before it was promulgated.

Finally, I am not unmindful of the fact that a distinguished court (the Massachusetts Supreme Judicial Court) has twice passed upon the issue of fair trial for this defendant. After the first affirmance certiorari was granted and the case remanded for reconsideration in light of *Ham.* That reconsideration was given and again there was affirmance. Certiorari was denied, three Justices vigorously dissenting, as appears in the opinion of Mr. Justice Marshall. 414 U.S. 1080, 94 S.Ct. 599, 38 L.Ed.2d 486.

The Supreme Court has stated that denial of certiorari has no legal significance—at least as to the merits of the controversy. Nor would I question the sound philosophy behind such an interpretation. Two cases in particular in which the opinions were written by Mr. Justice Frankfurter clearly demonstrate that "such a denial (of certiorari) carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review." Maryland v. Baltimore Radio Show, 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950). Again in 1953 the Supreme Court devoted itself in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), to the effect, if any, which might

be attributed to denial of certiorari. In a separate opinion (pp. 488–497, 73 S.Ct. 397) Mr. Justice Frankfurter set forth most specifically the reasons why no effect should be given to denial. The many instances cited of petitions "rarely drawn by lawyers," "almost unintelligible," inadequate records, no clear statements of the issues, the lack of importance of the issues, the mere numerical quantity of the petitions, all justify the conclusion that "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, . . . ." [11] Quite rightly did the Justice say: "The reasons why our denial of certiorari in the ordinary run of cases can be any number of things other than a decision on the merits are only multiplied by the circumstances of this class of petitions." *Brown, supra,* at 497, 73 S.Ct. at 441. However, this very expression is pregnant with the possibility as Mr. Justice Jackson pointed out in his separate opinion that "There may be circumstances so extraordinary that I do not now think of them which would justify a departure from this rule, but the ordinary run-of-the-mill case certainly does not." *Brown, supra,* at 545, 73 S.Ct. at 429.

This small opening in an otherwise seemingly impregnable fortress entitles one to peer into the interior—a hypothetical conference chamber in which consideration of certiorari in this case is being discussed. *Ham* for all practical purposes had just been decided. The constitutional issue of the "black" question presented by *Ross* was so clear that a remand was directed in light of *Ham.* When *Ross* next arrived it was in the same garb—no other questions, no procedural issues, no diminution in importance of the only issue—just the same single "black" question. If there were any doubt on the subject Mr. Justice Marshall must have made all conscious of the singleness of the issue in his dissent, Justices Douglas and Brennan joining. Under these circumstances I would be

11. United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923).

reluctant to characterize this case as an "ordinary run-of-the-mill case." The intervening remand had not created a new issue. If the absence of the "black" question called for remand on the first petition, its continued absence must have been noted on the second. Very possibly the denial of the *Ross* second certiorari petition has no legal significance but in my opinion the scope and intent of *voir dire* in the specific field of bias and prejudice as presented here has great legal significance. If counsel are permitted to endeavor to obtain via the *voir dire* a juror's commitment as to his views of prospective witnesses' credibility I foresee countless future appeals arising therefrom.

For these reasons—but primarily because I believe that the petitioner received a fair trial in Massachusetts—I dissent and would reverse the granting of the writ.