COMMONWEALTH *vs.* FRANK GRACE.

Bristol.    December 1, 1975. — August 3, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* Judicial discretion, New trial, Capital case, Examination of jurors.  *Evidence,* Cumulative, Relating to deliberation by jurors.  *Supreme Judicial Court,* Argument.

There was no abuse of discretion in the denial of a motion for a new trial based on affidavits of alleged eyewitnesses to a crime, including a codefendant who had refused to testify at the defendant's trial, and another witness who corroborated the defendant's alibi, where the affiants were all known to the defendant at the time of the trial and where the record supported the judge's findings that the proffered testimony was cumulative, unreliable, contradictory and not credible.  [750-753]

In a criminal case, there was no abuse of discretion in the denial of a motion for a new trial based on an affidavit of the defendant's fiancée in which she stated that during the course of the trial she had overheard a detective describing the defendant to a key prosecution witness where it appeared that defense counsel knew of the incident, if it occurred, and did not make use of it at the trial.  [753-754]

In a criminal case, there was no abuse of discretion in the denial of a motion for a new trial based on the fact that one of the jurors was acquainted with the defendant's family where that fact was known to the defendant and his attorney at the time of empanelling [754-755]; nor was a new trial warranted by jurors' statements regarding their deliberations [755].

At a murder trial, there was no error in the judge's refusal to ask prospective jurors specific questions regarding racial prejudice where both the defendant and the victim were black and where the case did not involve racial issues likely to distort the trial.  [755-757]

In the appeal of a criminal case, incorporation of assignments of error in a brief with mere assertions of legal conclusions does not constitute argument and is tantamount to a waiver of these assignments under S.J.C. Rule 1:13.  [757-758]

INDICTMENT found and returned in the Superior Court on October 4, 1972.

The case was tried before *Brogna,* J., and a motion for a new trial was heard by him.

*Daniel F. Featherston, Jr.,* for the defendant.

*Peter B. Gay*, Special Assistant District Attorney, for the Commonwealth.

QUIRICO, J.   This case is before the court pursuant to G. L. c. 278, §§ 33A-33G, on the defendant's appeal from his conviction of murder in the first degree and the resulting sentence of imprisonment to the Massachusetts Correctional Institution at Walpole for life. The defendant was tried together with his brother Ross Grace, who was found guilty of murder in the second degree, and with Donald Arnum and Phillip Glover, who received directed verdicts on the murder indictments and were found not guilty of assault and battery. After the defendant's appeal was entered, he filed a motion for a new trial and the case was remitted to the Superior Court for hearing. G. L. c. 278, § 33E. The trial judge heard the motion on affidavits and oral testimony, and he subsequently filed findings and an order denying the motion. The defendant appealed from the denial, the record was supplemented, and the appeal was duly reentered in this court.

The defendant's primary focus in this appeal is on the denial of his motion for a new trial. He also raises other assignments of error relating to the conduct of the trial; however, for reasons which will be stated later,[1] aside from the new trial issue we comment only on that assignment of error related to the alleged refusal by the trial judge to ask specific questions of prospective jurors relating to racial prejudice. We believe there was no error either in the denial of the defendant's motion for a new trial or in the judge's conduct of the trial. Accordingly, we affirm.

The evidence introduced by the Commonwealth and the defendant was highly contradictory. It was undisputed that the victim, Marvin Morgan, was shot on the street outside the West End Social Club in New Bedford on August 8, 1972, at approximately 11:30 P.M. after descending the stairs from the club. It was also undisputed that the shooting was observed by one Eric Baker, a cousin of

---

[1] See part 3, *infra.*

the victim, and one Jasper Lassiter, both of whom had accompanied the victim from Providence to New Bedford earlier in the evening. The remainder of the evidence was sharply disputed, the Commonwealth's witnesses contending that the defendant was present and shot the victim, the defendant's witnesses corroborating the defendant's own testimony that he was elsewhere at the time of the shooting.

The Commonwealth's chief witnesses, Baker and Lassiter, testified that they were coming down the stairs with the victim when two men, identified by them as the defendant Frank "Parky" Grace and his brother Ross Grace, approached with guns drawn. The Graces ordered them up against a wall, and, when Baker asked what was going on, he was told to get out of the way as he was not involved. There was some conversation regarding an alleged "rip off," and Ross Grace pointed out Lassiter and the victim as the persons who "took [him] off for $800." Glover, who had approached from another direction, threw punches at the victim, and then the defendant reached over Glover's shoulder and shot the victim in the chest. When Baker tried to intercede, the defendant hit him in the face with the gun and it went off.

Baker fled and flagged down a police cruiser. He told the officers that his cousin had just been shot, and they returned to the scene and took the victim to the hospital. On the way to the hospital, Baker gave the police the names or nicknames of the defendant, his brother Ross, and Donald "Dolomite" Arnum as persons involved in the shooting. At the police station, Baker identified the photograph of another person, but it was later determined that this other person was not involved or present at the scene.

Baker gave the police a statement the next morning. The statement, which was introduced on cross-examination, contained slight inconsistencies with Baker's trial testimony. In the statement, Baker had lied to the police about not using drugs. The defendant tried to impeach Baker's credibility by showing that he was a drug addict and a "pusher," and that he was due for a "fix" at the time

of the shooting. Lassiter also identified the defendant. A statement he made to police on the day of the shooting, which also contradicted in part his trial testimony, was introduced to impeach him, as was his history of drug addiction.

Various police officers testified for the Commonwealth regarding the arrest of the defendant, shortly after the homicide, on a street between the club and the defendant's home. The officers also corroborated Baker's version of his flagging down the cruiser and giving the police information about the incident.

The defendant testified in his own behalf. He related the events of the evening as follows: He was at the Elks Home in New Bedford from about 7 to 8:45 P.M., after which time he returned home to watch "Kung Fu" on television. When the program was over at 10 P.M., he met a friend, one Vern Rudolph, and they rode around, eventually stopping at the Cape Verdean Band Club about 11:15 P.M. He stayed there for approximately ten minutes, and then went to the Tropicana Club where he arrived at 11:30 P.M. He remained there "shooting craps" until about 11:45 P.M., when he and Rudolph went to the Cozy Lounge. When they arrived there, Eileen Sylvia, the defendant's then girl friend, told him that she had received a telephone call from the babysitter at the defendant's house telling her about a shooting at the West End Social Club. The three of them drove toward the club, and were told by persons in front of the place that there had been a shooting and that police officers were heading up to the defendant's house. The defendant got out of the car and ran toward his house where he was stopped by police officers and arrested. He claimed that he was not questioned about the homicide. The Commonwealth introduced records of his convictions for possession of a switchblade knife, assault, threatening bodily harm, and assault and battery to impeach his credibility. G. L. c. 233, § 21, as appearing in St. 1950, c. 426.

Several witnesses were called to corroborate the defendant's alibi testimony. The bartender at the West End Social Club testified that the defendant had not been at the

club earlier in the evening, contrary to Baker's testimony, and that he observed the defendant pull up in a car in front of the club with some other persons at approximately 12:15 A.M. One Leonard Gonsalves testified to seeing the defendant and Rudolph at the Tropicana Club at eleven ten or eleven fifteen that night, and to having an argument with him regarding a dice game. One Steven Lopes testified that he saw the defendant twice that night, the first time between nine and ten at the Cape Verdean Band Club, the second time about 11:45 P.M. at the Cozy Lounge. The defendant was also placed at the Cape Verdean Band Club with Rudolph about 11 P.M. by one Robert Grace, who had known the defendant for several years but was not related to him. One Bruce Ribeiro testified that he saw the defendant arrive with Rudolph in the area of the West End Social Club sometime after 11:30 P.M.

Rudolph testified and corroborated in detail the defendant's story. He described his travels with the defendant from club to club, ending at the Cozy Lounge shortly before midnight. His version differed only in that he stated that Eileen Sylvia had learned of the shooting from a cabdriver, and he was adamant on this point. Finally, Elizabeth Vieira, the babysitter at the defendant's apartment, testified that someone came to the house about an hour after "Kung Fu" ended and told her of trouble at the club, and she called Eileen Sylvia at the Cozy Lounge with that information. She also corroborated the defendant's testimony that he had been home to watch "Kung Fu" between 9 and 10 P.M.

1. The defendant filed a motion for a new trial based on evidence which he alleged to be "newly discovered and highly relevant." This evidence, which was contained in written affidavits and oral testimony, was introduced at the hearing on the motion for three purposes: (a) to support the abili defense developed at the trial, (b) to challenge the testimony of a government witness whose identification of the defendant was allegedly prompted by police, and (c) to demonstrate that one juror was not impartial. After a review of this evidence and of the trial transcript,

the judge concluded that there was "nothing in the 'newly discovered' evidence which would be anything more than cumulative," that "its absence at the trial did not in all likelihood make any difference in the jury's verdict," and that he was "not convinced that justice either was not, or may not have been, done at the trial." Accordingly, he denied the motion. There was no error.

(a) The defendant offered the affidavits and testimony of a number of persons to support his defense, four of whom allegedly were eyewitnesses to the shooting.[2] All of those alleged eyewitnesses testified at the hearing on the motion for a new trial that they observed the person who shot the victim, and, while unable to say who that person was, they could say it was not the defendant. Another affiant corroborated the testimony of the defendant and Rudolph as to his whereabouts at the time of the homicide. The judge found that none of these witnesses, nor their testimony, was "newly discovered . . . in the classic sense." He found that, while all the potential witnesses were known to the defendant, the alleged eyewitnesses did not testify at the trial for the following reasons: (a) Jo Ann Metts and Paul Bowen did not testify because they feared prosecution on outstanding criminal charges, (b) Gerald Ribeiro was not called because trial counsel believed his testimony was not necessary, and (c) Arnum did not testify because, as a codefendant, he was advised not to take the witness stand. The judge further found that the proffered testimony was cumulative and was unreliable, contradictory and not credible.

"The motion for a new trial on the ground of newly discovered evidence [is] addressed to the sound discretion of the trial judge." *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 542 (1971), and cases cited. Likewise, "[t]he weight and import of the affidavits submitted in support of the defendant's motion [are] for the trial judge's discretion," *Commonwealth* v. *Heffernan*, 350 Mass. 48, 53, cert.

---

[2] The four alleged eyewitnesses were Jo Ann Metts, Paul Bowen, Donald Arnum, and Gerald Ribeiro.

denied, 384 U.S. 960 (1966), *Commonwealth* v. *Corradino*, 368 Mass. 411, 423 (1975), and the "credibility due the evidence, especially ... [the] oral testimony, [is] to be decided by the trial judge who hears the witnesses." *Commonwealth* v. *Thompson*, 362 Mass. 382, 385 (1972). See *Commonwealth* v. *Bernier*, 359 Mass. 13, 16 (1971). His disposition of the motion "is not to be reversed unless a survey of the whole case shows that his decision, unless reversed, will result in manifest injustice." *Commonwealth* v. *DeChristoforo, supra* at 542-543, quoting from *Sharpe, petitioner*, 322 Mass. 441, 445 (1948). Accord, *Commonwealth* v. *Robertson*, 357 Mass. 559, 562 (1970).

We have closely examined the transcripts of both the trial and the hearing on the defendant's motion, and "we cannot say that the judge could not 'conscientiously, intelligently and honestly have reached the result he has reached.'" *Commonwealth* v. *Stout*, 356 Mass. 237, 242 (1969), quoting from *Commonwealth* v. *Sacco*, 259 Mass. 128, 140 (1927). "The judge's decision, as to the extent that it involves ... findings of fact, is supported by our examination of the evidence ...." *Commonwealth* v. *Thompson, supra.*

The judge was warranted in disbelieving the affidavits and testimony of the prospective witnesses. See *Commonwealth* v. *Leate*, 361 Mass. 347, 349-350 (1972). Several of these witnesses were admitted friends of the defendant, and their testimony was "likely to be untrustworthy." *Commonwealth* v. *Stout, supra* at 243. The affidavit of Arnum, a codefendant who did not testify, "is the weakest sort of evidence," *Dirring* v. *United States*, 353 F.2d 519, 520 (1st Cir. 1965),[3] and the judge was not required to believe it. Furthermore, all of this evidence contradicted the testimony of several trial witnesses who were apparently credited by the jury, and the judge was entitled to make use of his knowledge of what had occurred at the

---

[3] "Indeed, if a new trial could be predicated as of right upon a codefendant's change of heart after failure to take the stand there could always be a second chance for everyone." 353 F.2d at 520.

trial in ruling on the motion. *Commonwealth* v. *Bernier, supra. Commonwealth* v. *DeChristoforo, supra* at 543. *Commonwealth* v. *Corradino,* 368 Mass. 411, 423 (1975). Finally, in light of the fact that at least seven witnesses testified at the trial to corroborate the defendant's story, we cannot say that the judge erred in ruling this evidence cumulative. See *Commonwealth* v. *Capalbo,* 308 Mass. 376, 384-385 (1941).

(b) The defendant offered the affidavit of Lynette Bingham, his fiancée, regarding an incident which allegedly occurred during the course of the trial. Bingham stated that, while she was in the court house waiting to testify, she overheard a detective involved with the case talking to Baker, a key Commonwealth witness. She claimed that the detective told Baker, who was to be the next witness, that "Frank Grace is wearing dark green pants, a green print shirt and glasses." At that point, Charles Perry, a friend of Bingham, approached, and Baker asked the detective who he was. The detective answered and left. Perry then approached Baker to inquire why his name had been mentioned. Baker answered that he thought Perry was Ross Grace. Bingham immediately reported this incident to the defendant's attorney, who asked her to keep listening.

Perry filed an affidavit and testified in support of the defendant's motion in a manner which corroborated Bingham's story. The detective testified at the hearing and completely denied that the incident ever occurred.

Regarding this incident, the trial judge stated that, "if it happened at all, it apparently was reported to defense counsel and it was their decision not to make any use of it." The judge was free to disbelieve this evidence, *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 543 (1971), and cases cited, and in this regard his decision will not be reversed. Furthermore, the judge acted well within his permissible range of discretion in concluding that counsel's failure to make use of this evidence at trial, when it was known to him, was a tactical choice and that the defendant is thus precluded from arguing that it was error at this

stage of the proceedings. *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 226-227 (1973), and cases cited. *Commonwealth* v. *Johnson,* 352 Mass. 311, 317, cert. granted, 389 U.S. 816 (1967), cert. dismissed, 390 U.S. 511 (1968). *Commonwealth* v. *Doyle,* 323 Mass. 633, 638 (1949).

(c) The defendant offered the affidavit and oral testimony of Bingham with reference to statements made by several of the jurors. The first allegation states that one juror, Julia Oliveira, stated that she knew the Grace family but did not advise the judge of this fact during the empanelling of the jury. However, the fact that the juror was acquainted with the Grace family was known to the defendant and his attorney at the time of empanelling, and the judge believed that this acquaintance was not revealed because the defendant "must have thought that it would be helpful ... to have this juror remain on the panel ...." We agree with the judge that, "[h]aving made this choice at the time of trial, [the defendant] cannot now urge it as a ground for a new trial." See *Commonwealth* v. *McLaughlin, supra.*

In any case, the granting of a new trial on grounds of juror disqualification is within the trial judge's discretion, and is required only where the disqualification has operated injuriously to the defendant, has tended to an erroneous verdict, or has otherwise worked injustice. *Commonwealth* v. *Sires, ante,* 541, 545-546 (1976). *Commonwealth* v. *Delle Chiaie,* 323 Mass. 615, 618-619 (1949). See *Commonwealth* v. *Theberge,* 330 Mass. 520, 529 (1953). There is nothing in the record which would indicate that the presence of Oliveira on the jury affected the trial in such a way, and accordingly there was no abuse of discretion in the denial of the defendant's motion for a new trial.

In her affidavit and testimony, Bingham also stated that she and Maria Grace, wife of Ross Grace, spoke to two of the jurors who served on the case, and these jurors told them that it would have made a real difference if Arnum had taken the stand; that if one person present at the scene had testified that the assailants were not Frank and Ross Grace the outcome would have been different, and

that jurors tended to prejudge the case after reading newspaper reports.

It is well settled that the testimony of jurors regarding their deliberations is not admissible to impeach their verdict. *Commonwealth* v. *Meserve,* 156 Mass. 61, 62 (1892). Cf. *Commonwealth* v. *Coggins,* 324 Mass. 552, cert. denied, 338 U.S. 881 (1949). It is also not admissible to demonstrate the need for a new trial. *Commonwealth* v. *Harrison,* 368 Mass. 366, 374-376 (1975). Accordingly, the judge was correct in denying the motion for a new trial on this ground.

2. In the defendant's first assignment of error allegedly committed at the trial, he contends that the judge erred in refusing to ask specific questions of prospective jurors regarding possible racial prejudice.[4] The total argument by the defendant on this issue in his brief consists of a six-line paragraph which acknowledges the position taken on the issue by this court in *Commonwealth* v. *Ross,* 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973), and then says that "these defendants respectfully disagree" with that position. For all of the reasons stated in part 3, *infra,* of this opinion, that treatment of the issue is tantamount to a waiver of that assignment of error, and we are not required to deal with it. However, because of recent decisions in this area of the law, we deem it appropriate to comment on the subject by way of dictum.

At the outset, we note that this case does not involve a black defendant and a white victim. Both the defendant and the victim are black. Neither does this case involve racial issues which were likely to distort the trial. Absent either of these factors, no special inquiry of prospective jurors was constitutionally required. *Ristaino* v. *Ross,* 424

---

[4] The particular questions requested were as follows: "Do you feel a black man is more likely to be guilty than a white man? Do you feel because the defendant is black, he is guilty until he proves he is innocent or until his innocence is proven? Do you feel a black person has the same moral standards as a white person? Do you feel blacks have any lower standards of morality than whites? Do you believe a black is more likely than a white to commit a crime?"

U.S. 589 (1976). *Ham* v. *South Carolina,* 409 U.S. 524, 527 (1973). *Commonwealth* v. *Core, ante,* 369, 373-376 (1976). *Commonwealth* v. *Lumley,* 367 Mass. 213 (1975).

In *Ristaino* v. *Ross,* the United States Supreme Court reversed a judgment of the District Court which granted the petitioner a writ of habeas corpus. In doing so, the Court explained its prior decision in the *Ham* case, and stated that "*Ham* did not announce a requirement of universal applicability." 424 U.S. at 596. Rather, it established a requirement that, where the circumstances are such that there is a "constitutionally significant likelihood" that racial prejudice may prevent an impartial jury from being empanelled, questions regarding racial bias should be propounded. *Ibid.* The Court then made it clear that such a likelihood exists only where "[r]acial issues ... [are] inextricably bound up with the conduct of the trial." 424 U.S. at 596-597.

The result reached by the Court is consistent with our interpretation of the *Ham* case. See *Commonwealth* v. *Ross,* 363 Mass. 665, cert. denied, 414 U.S. 1080 (1973); *Commonwealth* v. *Lumley, supra.* In *Lumley,* we construed the *Ham* case as limited to the particular facts of that case, where the defendant alleged that he was framed by police who were "out to get him" because of his civil rights activities. 367 Mass. at 215. In the instant case, while there is some hint that the defendant was a black leader, there was no evidence to that effect, and there is certainly nothing in the record which indicates the presence of racial issues of the nature or extent of those present in the *Ham* case.

Our holding in this regard is bolstered by the recent decision of the United States Court of Appeals in *Dukes* v. *Waitkevitch,* 536 F.2d 469 (1st Cir. 1976), reversing a grant by the District Court of the petitioner's writ of habeas corpus. That decision also reads *Ristaino* v. *Ross, supra,* as requiring questioning on racial bias only in "[c]ases ... in which the charges and defenses explicitly implicate racial issues, and not those which involve racial

prejudice, by inference, through the identities of the parties." 536 F.2d at 470.

While what we have said to this point disposes of the issue, even if we were to have held that the defendant was constitutionally required to have prospective jurors questioned about possible racial bias, the questions asked by the trial judge were clearly sufficient.

It is well settled that, even where such questioning is required, "the trial judge [is] not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by [the defendant]." *Ham* v. *South Carolina, supra* at 527. Accord, *Commonwealth* v. *Core, supra.* In this case, the judge advised the prospective jurors that the defendants and the principal witnesses were black. He then asked each prospective juror a series of specific questions aimed at discovering racial bias.[5] We believe that these questions were clearly sufficient to meet the requirements of the decision in the *Ham* case if that decision were applicable to the present case, and that they were also sufficient to meet the requirements of G. L. c. 234, § 28, as amended by St. 1973, c. 919.

3. The defendant's appeal includes five other assignments of error relating to the admission and exclusion of evidence and to the denial of his motion for a mistrial. The defendant's brief, however, contains only one sentence of argument[6] which is meant to apply to all these alleged

---

[5] The judge asked the following questions: "Do you realize that [the] presumption of innocence applies to blacks as well as to whites? Does the fact that the defendants are black make you feel that they are more likely guilty than innocent because of their color? Can you fairly and impartially decide the case on the basis of the evidence and the law, disregarding the race of the defendants? Do you believe that the testimony of a black person is less believable than that of any other race?"

[6] The sentence in the brief is as follows: "The Court is asked to give effect to the often cited precept that evidence whose probative effect is far outweighed by its prejudicial impact should be excluded, insofar as these evidence rulings are concerned." There is no citation of authority.

errors and which is included "solely for technical compliance with any subsequent requirement that they not be here waived."

It is well settled that assignments of error not argued are considered waived. S.J.C. Rule 1:13, 351 Mass. 738 (1967). *Commonwealth* v. *Bys, ante,* 350, 351 (1976). *Commonwealth* v. *Baker,* 368 Mass. 58, 61 (1975). *Commonwealth* v. *Caine,* 366 Mass. 366-367 n.1 (1974). *Commonwealth* v. *Baldassini,* 357 Mass. 670, 679 (1970). *Commonwealth* v. *Nassar,* 351 Mass. 37, 49 (1966). It is equally well established that mere incorporation of the assignments into the brief, *Commonwealth* v. *Flynn,* 362 Mass. 455, 480 (1972), or mere assertions or "capsule type" references to an issue, *Commonwealth* v. *Martin,* 358 Mass. 282, 290 (1970); *Commonwealth* v. *Roberts,* 362 Mass. 357, 369 (1972), warrant our treating that issue as waived for failure to argue it. Cf. *Commonwealth* v. *Bernier,* 366 Mass. 717, 719 (1975). The defendant's mere assertion of a legal conclusion, without citation of supporting authority or any real amplification of the issue, is the type of assertion or reference which we have consistently held insufficient to comply with our rules. See *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 232 (1973). Because we hold that the defendant has failed to argue these assignments within the meaning of Rule 1:13, we do not consider them. *Commonwealth* v. *Bernier, supra.* The defendant has neither the right nor the power to expect or require us to consider them by his mere statement that he does not intend to waive them.

4. We have considered the whole case on the law and the evidence pursuant to our obligation under G. L. c. 278, § 33E. We have done so with particular care to determine whether the evidence introduced on the defendant's motion for a new trial indicates that justice may not have been done in this case. On the basis of our review we conclude that the jury's verdict was proper, and that neither the "new" evidence nor the conduct of the trial itself warrants our ordering a new trial or reducing the verdict to a

lesser degree of guilt. See *Commonwealth* v. *DeChristoforo,* 360 Mass. 531, 543-544 (1971).

> *Order denying motion for new*
> *trial affirmed.*
> *Judgment affirmed.*